No. 25-2546

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

NATIONAL SHOOTING SPORTS FOUNDATION,

*Appellant*,

v.

ATTORNEY GENERAL OF NEW JERSEY,

*Appellee*.

_____

On Appeal from the United States District Court for the District of New Jersey,
No. 3:22-cv-06646

_____

## BRIEF FOR APPELLANT

_____

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, PC
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040

ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellant*

October 28, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the National Shooting Sports Foundation certifies that it does not have a parent corporation and that no publicly held corporation owns more than 10% of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES.................................................................................... iv

INTRODUCTION ................................................................................................... 1

JURISDICTION...................................................................................................... 4

STATEMENT OF THE ISSUE................................................................................ 4

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................. 4

STATEMENT OF THE CASE................................................................................ 5

    A.    Legal and Factual Background............................................................ 5

    B.    Procedural Background ........................................................................ 9

        1.    The district court enters a preliminary injunction..................... 9

        2.    The Attorney General secures dismissal of this lawsuit by promising not to sue industry members under A1765 for conduct that is not "unlawful in itself" .............................. 10

        3.    The Attorney General starts suing industry members under A1765 for conduct that is not "unlawful in itself"...................................................................................... 10

        4.    NSSF reopens its challenge .................................................... 13

        5.    The district court holds that it must abstain under *Younger* due to the suit against Glock...................................... 14

STANDARD OF REVIEW .................................................................................... 17

SUMMARY OF ARGUMENT............................................................................... 17

ARGUMENT ......................................................................................................... 18

I.    The *Younger* Doctrine Is Categorically Inapplicable Here........................... 18

    A.    This Suit Does Not Ask a Federal Court to Intercede in or Enjoin State Proceedings.................................................................... 18

B.     NSSF Is Not a Party to the State-Court Litigation Against Glock ............................................................................... 23

II.   The District Court's (Mis)application Of *Younger* Fails On Its Own Terms ......................................................................................... 34

A.     The Suit Against Glock Is Not "Quasi-Criminal".............................. 35

B.     NSSF Lacks an Adequate Opportunity to Raise Its Claims in the Action Against Glock, Which Postdates This Case in All Events ............................................................................... 38

1.     There were no "ongoing judicial proceedings" in state court under A1765 when NSSF filed this lawsuit ................... 39

2.     NSSF lacks anything close to an "adequate opportunity" to assert its claims in the *Glock* suit .................. 43

III.   Federal Intervention Is Necessary Here To Prevent Irreparable Harm And To Ensure That Gamesmanship Is Not Rewarded ................................ 46

CONCLUSION ....................................................................................... 54

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996).........................................................................49

*ACRA Turf Club, LLC v. Zanzuccki*,
    748 F.3d 127 (3d Cir. 2014) ......................................... 17, 36, 37, 38

*Argen v. Att'y Gen. N.J.*,
    2022 WL 3369109 (3d Cir. Aug. 16, 2022) ......................... 17, 21, 23

*Bigelow v. Virginia*,
    421 U.S. 809 (1975).........................................................................49

*Borowski v. Kean Univ.*,
    68 F.4th 844 (3d Cir. 2023).......................................................21, 53

*Burg v. Platkin*,
    2024 WL 5198776 (D.N.J. Dec. 23, 2024)................................24, 33

*Cedar Rapids Cellular Tel., L.P. v. Miller*,
    280 F.3d 874 (8th Cir. 2002)...............................................24, 27, 28

*Cohens v. Virginia*,
    19 U.S. (6 Wheat.) 264 (1821)........................................................19

*District of Columbia v. Beretta U.S.A. Corp.*,
    940 A.2d 163 (D.C. 2008).................................................................6

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975)...........................................................27, 31, 40

*FOCUS v. Allegheny Cnty. Ct. of Common Pleas*,
    75 F.3d 834 (3d Cir. 1996).........................................................44, 45

*For Your Eyes Alone, Inc. v. City of Columbus*,
    281 F.3d 1209 (11th Cir. 2002).......................................................41

*Gibson v. Berryhill*,
    411 U.S. 564 (1973).........................................................................53

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
527 U.S. 173 (1999) .................................................................49

*Haw. Hous. Auth. v. Midkiff,*
467 U.S. 229 (1984) ............................................................ 20, 39

*Hicks v. Miranda,*
422 U.S. 332 (1975) ......................................................... 30, 31, 40

*Hill v. Snyder,*
878 F.3d 193 (6th Cir. 2017) ............................................. 39, 40, 41

*Hoover v. Wagner,*
47 F.3d 845 (7th Cir. 1995) .......................................................45

*Huffman v. Pursue,*
420 U.S. 592 (1975) ...................................................................36

*Jonathan R. v. Justice,*
41 F.4th 316 (4th Cir. 2022) ......................................... 20, 21, 22, 26

*Junior Sports Mags. Inc. v. Bonta,*
80 F.4th 1109 (9th Cir. 2023) .....................................................49

*Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n,*
791 F.2d 1111 (3d Cir. 1986) .......................................................23

*Lorillard Tobacco Co. v. Reilly,*
533 U.S. 525 (2001) ...................................................................49

*Malhan v. Sec'y U.S. Dep't of State,*
938 F.3d 453 (3d Cir. 2019) ................................................... 20, 34

*Marks v. Stinson,*
19 F.3d 873 (3d Cir. 1994) .................................................. 22, 23, 26

*Mass. Delivery Ass'n v. Coakley,*
671 F.3d 33 (1st Cir. 2012) .........................................................29

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,*
457 U.S. 423 (1982) ........................................... 34, 39, 43, 46

*N.J.-Pa. Presbytery of the Bible Presbyterian Church
v. N.J. State Bd. of Higher Educ.*,
 654 F.2d 868 (3d Cir. 1981) ........................................................... *passim*

*N.Y. Times Co. v. Sullivan*,
 376 U.S. 254 (1964) ........................................................................51

*Nationwide Biweekly Admin., Inc. v. Owen*,
 873 F.3d 716 (9th Cir. 2017) .........................................................42

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
 491 U.S. 350 (1989) ........................................................ 19, 21, 23, 53

*NSSF v. Att'y Gen. N.J.*,
 80 F.4th 215 (3d Cir. 2023) ........................................................ *passim*

*Olde Disc. Corp. v. Tupman*,
 1 F.3d 202 (3d Cir. 1993) ......................................................... 18, 46

*PDX N., Inc. v. Comm'r N.J. Dep't of Lab. & Workforce Dev.*,
 978 F.3d 871 (3d Cir. 2020) .................................................. 18, 39, 45

*Reno v. ACLU*,
 521 U.S. 844 (1997) ................................................................ 50, 51

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
 397 F.3d 56 (1st Cir. 2005) ............................................................23

*Smith & Wesson Brands, Inc. v. Att'y Gen. N.J.*,
 27 F.4th 886 (3d Cir. 2022) ....................................................... *passim*

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
 605 U.S. 280 (2025) ........................................................................5

*Sorrell v. IMS Health Inc.*,
 564 U.S. 552 (2011) .......................................................................52

*Sprint Commc'ns, Inc. v. Jacobs*,
 571 U.S. 69 (2013) ................................................................. *passim*

*T Mobile Ne. LLC v. City of Wilmington*,
 913 F.3d 311 (3d Cir. 2019) ..........................................................42

*Thornhill v. Alabama*,
310 U.S. 88 (1940)........................................................51

*Tokyo Gwinnett, LLC v. Gwinnett Cnty.*,
940 F.3d 1254 (11th Cir. 2019).....................................41

*Tony Alamo Christian Ministries v. Selig*,
664 F.3d 1245 (8th Cir. 2012)........................... 24, 29, 30

*Tucker v. Ann Klein Forensic Ctr.*,
174 F.App'x 695 (3d Cir. 2006).....................................41

*Tull v. United States*,
481 U.S. 412 (1987).......................................................36

*Younger v. Harris*,
401 U.S. 37 (1971)............................................... *passim*

**Statutes and Rule**

15 U.S.C. §7901(a)(5)......................................................5

15 U.S.C. §7902(a) ..........................................................5

15 U.S.C. §7903(3) ..........................................................5

15 U.S.C. §7903(5)(A)............................................ 5, 6, 7

15 U.S.C. §7903(5)(B)......................................................6

N.J.S. §2C:58-33(d).........................................................8

N.J.S. §2C:58-34 .............................................. 8, 48, 50

N.J.S. §2C:58-35(a)(1).......................................... *passim*

N.J.S. §2C:58-35(a)(1)-(3)................................... 8, 36

N.J.S. §2C:58-35(a)(2).......................................... 8, 49

N.J.S. §2C:58-35(b) .........................................................9

N.J.S. §2C:58-35(c) .........................................................9

N.J.S. §2C:58-35(e) ............................................... 9, 52

Pub. L. No. 109-92, 119 Stat. 2095 (2005) ................................................. 5

Fed. R. Civ. P. 15(c)(1) ................................................................................ 42

**Other Authorities**

Gov. Andrew M. Cuomo, *Governor Cuomo Signs First-in-the-Nation
    Gun Violence Disaster Emergency to Build a Safer New York*,
    YouTube (July 6, 2021), https://bit.ly/3UyZoSx ................................. 7

Restatement (Second) of Torts (1977) ....................................................... 51

Restatement (Second) of Torts (1979) ....................................................... 36

## INTRODUCTION

In 2022, the National Shooting Sports Foundation ("NSSF") filed this suit challenging New Jersey Assembly Bill 1765 (2022) ("A1765"), a then-new law specifically designed to evade the judgment of Congress and the Constitution. The district court initially agreed with NSSF about the fundamental infirmity of A1765— which imposes a novel form of public nuisance liability on members of the firearm industry even when they do not engage in any conduct that is unlawful in itself— holding the statute likely preempted, expressing doubts as to whether it could survive scrutiny under the First Amendment, and enjoining the state from enforcing it.

Having lost in district court, the state changed tack on appeal, disavowing at oral argument before this Court any intention to enforce A1765 based on conduct that did not violate some other law. This Court credited that disavowal and reversed, holding that NSSF's members did not face a sufficiently concrete threat to bring a pre-enforcement action. But the promise of unilateral disarmament proved short-lived. Mere months after securing dismissal of this case, the Attorney General began doing exactly what he assured this Court he would not do: filing numerous lawsuits under A1765—including one against Glock, Inc. ("Glock"), one of NSSF's 10,000-odd members—that sought to impose liability under A1765 despite not alleging that the industry member had violated any law other than A1765.

Given that remarkable about-face, NSSF moved to reopen the case. And the district court agreed with NSSF that the state's flip-flop meant that NSSF has now cleared the Article III hurdle. But it then pulled the rug out from under NSSF and its thousands of members—holding that, in light of the Attorney General's late-breaking enforcement action against a single NSSF member, the court must abstain in NSSF's challenge under *Younger v. Harris*, 401 U.S. 37 (1971).

That decision is as wrong as it is perverse. As things stand now, NSSF was barred from challenging A1765 in federal court before the state enforced it against an NSSF member, and then became barred from challenging A1765 in federal court as soon as the state enforced it against an NSSF member. Nothing in *Younger* or its progeny requires that aberrant result. Indeed, *Younger* abstention should not even be in the picture here. The Supreme Court has made clear that when a federal lawsuit does not request or require relief that would upset any ongoing state litigation, and instead just asks a federal court to decide federal issues that are also being litigated in state court, the federal court's "dominant instruction" is to "hear and decide [the] case," "even in the presence of parallel state proceedings." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77, 81-82 (2013). And, here, NSSF took the federalism-preserving step of disavowing any relief in its reopened federal action that would interfere with the state's late-breaking suit against Glock.

That alone confirms that the district court erred in abstaining. NSSF is not a party to any state-court proceeding under A1765, and while one of its members is, NSSF has explicitly disclaimed any intention of asking the federal courts to enjoin or otherwise intervene in the *Glock* suit. That was not some empty gesture. NSSF in no way controls or directs Glock, and vice versa, and enjoining the *Glock* suit would not begin to secure NSSF all the relief it seeks here. This is thus not a circumstance where ruling in a federal-court plaintiff's favor would inevitably pretermit a state-court action against a related-but-distinct party. The court should have rejected *Younger* from the jump.

But even if *Younger* were on the table, the district court's application of the doctrine fails on its own terms. State-court civil cases do not trigger *Younger* unless they are "akin to criminal prosecutions." *Sprint*, 571 U.S. at 72. As this Court recognized last time the case was before it, A1765 is "exclusively" and "purely civil." Furthermore, the *Glock* suit was filed long after NSSF secured a preliminary injunction in this case, so it was not "ongoing" for purposes of *Younger*. And NSSF does not have any remotely adequate opportunity to raise its federal claims in that state-court action anyway. The district court suggested that NSSF could intervene in state court. But even if that were a possibility (and it is highly doubtful that it is), this Court has explicitly rejected the argument that the potential for state-court intervention suffices to trigger *Younger*. And rightly so, as the contrary view would

allow the narrow *Younger* exception to swallow the rule that federal courts must exercise jurisdiction duly conferred upon them.

In short, the decision below is wrong multiple times over. Moreover, given the unusual facts of this case, federal intervention would be warranted even if *Younger* had some theoretical role to play, as the district court has already held that A1765 is likely preempted by federal law, the statute is patently violative of express constitutional protections, and the only reason there is even an argument about *Younger* abstention (rather than a federal-court judgment already on the books) is because the state made promises to this Court that it proved unwilling to keep. For any and all of those reasons, this Court should reverse.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331 and §1343(a)(3). It denied NSSF's motion for a preliminary injunction on July 10, 2025. JA.25. NSSF timely filed a notice of appeal on August 8, 2025. JA.1; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court erred in abstaining under *Younger* and its progeny. JA.14-23, 342-46, 822-23.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case was previously before this Court as No. 23-1214 (3d. Cir.).

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

1. Congress enacted the Protection of Lawful Commerce in Arms Act in 2005 to stamp out efforts by state and local governments to use nebulous nuisance and negligence theories to tag law-abiding manufacturers and sellers of legal firearms with massive liability for harms caused by criminals who misuse their products. Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§7901-7903). That purpose is evident on the statute's face:  Congress declared in the text that the PLCAA's core aim is to prevent lawsuits seeking redress from businesses engaged in lawful commerce "for the harm caused by those who criminally or unlawfully misuse firearm products … that function as designed and intended."  15 U.S.C. §7901(a)(5).  To that end, the PLCAA prohibits "any person," "including any governmental entity," from bringing any "civil action" "against a manufacturer or seller of a [firearm or related] product" that seeks "damages … or other relief" to redress injuries "resulting from the … misuse of a [firearm or related] product by … a third party."  *Id.* §§7902(a), 7903(3), (5)(A).  This is not just a defense against liability:  As the state has acknowledged, the PLCAA confers a substantive "immunity" from certain kinds of suits altogether.  CA3.No.23-1214.Dkt.11 at 16; *see also Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 299 (2025) (discussing "PLCAA-granted immunity").

That immunity is subject to only a handful of exceptions for engaging in some well-defined type of misconduct. For example, the PLCAA allows actions against federally licensed firearms retailers for supplying a firearm to someone that they "know[], or reasonably should know, … is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C. §7903(5)(A)(ii), (B). It also exempts actions for breach of contract or warranty and product defect, as well as actions brought by the Attorney General of the United States to enforce certain specified federal laws. *Id.* §7903(5)(A)(iv)-(vi).

Finally, and as particularly relevant here, the PLCAA does not immunize industry members against actions in which a manufacturer or seller is alleged to have "knowingly violated a State or Federal statute applicable to the sale or marketing of [a firearm or related] product" where "the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii). This provision has come to be known as the "predicate exception" because, "to take effect, it requires that the manufacturer or seller have committed an underlying (or predicate) statutory violation." *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 168 (D.C. 2008). Congress made clear, however, that not just any statutory violation suffices to trigger it. By its terms, the predicate exception covers only actions that require a "knowing[]" violation that was "a proximate cause" of the injury for which redress is sought. 15 U.S.C. §7903(5)(A)(iii). And it includes two illustrative examples of

the types of statutes that suffice to trigger the exception, each of which imposes specific obligations on how firearms may be sold: a law imposing record-keeping requirements; and a law prohibiting firearms suppliers from aiding, abetting, or conspiring in straw purchases of their products. *Id.* §7903(5)(A)(iii)(I)-(II).

2. The PLCAA accomplished Congress' goal of preventing state and local governments from using tort litigation to make firearms manufacturers and sellers pay to redress the societal costs of criminals' misdeeds for a while. But not forever. In 2021, New York enacted a first-of-its-kind anti-PLCAA statute specifically designed to "reinstate the public nuisance liability for gun manufacturers" that the PLCAA forbids and thus "right the wrong" the state believed Congress committed "16 years" earlier in passing the PLCAA. Gov. Andrew M. Cuomo, *Governor Cuomo Signs First-in-the-Nation Gun Violence Disaster Emergency to Build a Safer New York*, YouTube, at 35:00-38:15 (July 6, 2021), https://bit.ly/3UyZoSx.

3. And in 2022, New Jersey enacted A1765, an equally naked effort to revive the very nuisance and negligence theories that Congress enacted the PLCAA to inter. A1765 creates two new "cause[s] of action for public nuisance" that apply only to "gun industry members," i.e., those "engaged in the sale, manufacturing, distribution, importing or marketing of a gun-related product."[1] N.J.S. §§2C:58-

---

[1] "Gun-related product" is defined as "any firearm, ammunition, ammunition magazine, firearm component or part" that "was possessed in this State" (by anyone, including criminals who illegally brought to the product into the state) "and as to

33(d), -34, -35(a)(1)-(3). First, "[a] gun industry member" may be held liable for "the sale, manufacturing, distribution, importing, or marketing of a gun-related product," *even if its conduct was not* "*unlawful*," if a court later deems it to have been "unreasonable under all the circumstances" and to have "recklessly … contribute[d] to a public nuisance in this State." *Id.* §2C:58-35(a)(1). The statute broadly defines "public nuisance" as "any condition" that "contributes to the … endangerment of the … peace, comfort, or convenience of others." *Id.* §2C:58-34.

Second, A1765 imposes liability anytime an industry member fails to "establish, implement, and enforce reasonable controls regarding its manufacture, sale, distribution, importing, and marketing of gun-related products"—which A1765 (unhelpfully) defines to mean unidentified "reasonable procedures, safeguards, and business practices" that are designed to "prevent the loss … or theft of a gun-related product" and "prevent the sale or distribution of a gun-related product to … a person prohibited from possessing a firearm"—again, even if the industry member complied with all existing legal obligations. *Id.* §§2C:58-34, -35(a)(2). Under those provisions, an industry member can be held responsible for a public nuisance based

---

which it was reasonably foreseeable that the product would be possessed or used in this State" (by anyone, again including criminals), even if the industry member did not manufacture or sell it in New Jersey. N.J.S. §2C:58-34.

entirely on a finding that its not-"unlawful" "marketing" of its not-"unlawful" products was not sufficiently "reasonable" to meet with New Jersey's liking.

A defendant's intent is not relevant to liability. *See id.* §2C:58-35(c). Nor is proof of "special injury" required. *See id.* Finally, proximate cause is "deemed" to be satisfied based solely on a loose form of foreseeability. *Id.* §2C:58-35(e).

A1765 vests the Attorney General with the power to "commence an action to seek" a host of remedies for this (not-unlawful) conduct that nonetheless constitutes a "nuisance," including: injunctive relief; "an order providing for abatement of the nuisance at the expense of the defendant; restitution; damages;" attorneys' fees and costs; "and any other appropriate relief." *Id.* §2C:58-35(b).

## B. Procedural Background

NSSF is the trade association for the firearm, ammunition, and hunting and shooting sports industry. Shortly after A1765 was enacted, NSSF filed this lawsuit seeking a preliminary injunction and a declaration that A1765 is preempted and unconstitutional. What followed was a torturous path.

### 1. The district court enters a preliminary injunction.

The district court granted a preliminary injunction, concluding that NSSF is likely to succeed on its claim that A1765 is preempted, as A1765 "directly conflict[s] with the intention of Congress." JA.39. The court noted that it "has concerns as to whether A1765 can survive on Constitutional grounds" even beyond preemption, but

declined to "address th[ose] issues at this time." JA.40. Finally, the court concluded that the remaining preliminary-injunction factors weighed in favor of relief too. JA.44-45.

> **2.** **The Attorney General secures dismissal of this lawsuit by promising not to sue industry members under A1765 for conduct that is not "unlawful in itself."**

This Court vacated the injunction. 80 F.4th 215 (3d Cir. 2023). In doing so, however, this Court did not question the district court's decision on the merits. *Id.* at 217-18. It instead dismissed for lack of standing because A1765 had "not been enforced against anyone, let alone [NSSF] or its members," and the Attorney General expressly "disavowed" any intention to "prosecut[e] [NSSF] or its members just for participating in 'lawful commerce.'" *Id.* at 220-21 (quoting Oral Arg. at 5:23-35). Finally, what "seal[ed] the case" for the Court was A1765's "exclusively" and "purely civil nature," which counseled against finding that the risk of enforcement would chill constitutionally protected conduct. *Id.* at 222-23.

> **3.** **The Attorney General starts suing industry members under A1765 for conduct that is not "unlawful in itself."**

Less than three months after New Jersey secured that decision based on a representation that it would not sue under A1765 for conduct that was not "unlawful in itself," N.J.S. §2C:58-35(a)(1)—i.e., did not violate some law *other than* A1765— the Attorney General engaged in a remarkable about-face. He launched a campaign

of A1765 actions in state court against industry members for conduct that is not even arguably (and was not alleged by the state to be) "unlawful in itself."

In a pair of enforcement actions filed in November 2024, the Attorney General sought to hold federally licensed firearm dealers (Point Blank Gun and Ammo LLC and Butch's Gun World, respectively) liable under A1765 for failing to determine whether customers who purchased magazines and rifle ammunition were prohibited from possessing firearms.  JA.641-43; JA.660-62.  Nothing in federal law or New Jersey law (besides, supposedly, A1765) requires retailers to do that, because neither the FBI nor New Jersey can or will run a background check for a non-firearm purchase.  As a result, nothing in either the *Point Blank* complaint or the *Butch*'s complaint claimed that the conduct that allegedly violated A1765 was unlawful in itself.  Instead, both complaints raised a single count for failure to enforce reasonable controls under §2C:58-35(a)(2).  JA.641-42; JA.660-61.[2]  The Attorney General filed still another A1765 suit in 2024 seeking punitive damages and restitution from out-of-state industry members for the lawful sale in Pennsylvania of firearm kits that are legal in Pennsylvania, on the theory that those companies are responsible for any harms caused by persons who lawfully purchase the kits in Pennsylvania and

---

[2] The Attorney General ultimately settled with Point Blank, who could not afford to litigate the enforcement action.  *See* D.Dkt.52.  The Attorney General secured a judgment against Butch's on the same theory, but the state court pointedly denied his request to make the small retailer pay over $60,000 in attorneys' fees.  JA.927.

unlawfully bring them into New Jersey, convert them into firearms that they are prohibited from possessing, and/or use them to commit crimes in the Garden State. JA.527-30, 544.[3]

NSSF initially hoped that those A1765 suits would prove isolated incidents— or at least would not reach NSSF's members, given the representations the Attorney General made to this Court in securing dismissal of NSSF's challenge. But the Attorney General laid to rest any such hope when, just a few weeks after filing the *Butch's* and *Point Blank* suits, he brought a sweeping A1765 suit seeking to hold Glock (an NSSF member) liable for the purported "nuisance" of harms caused by third parties who unlawfully convert legal Glock pistols into illegal machineguns using a small machine-gun-conversion device that is illegal to manufacture, sell, import, or even possess. *See* JA.745-51. In that action, the state seeks to bar Glock from marketing and selling some of the most popular handguns in the country. *See* JA.700.[4]

---

[3] The latter complaint at least made the argument that the out-of-state sales were unlawful in themselves under an aiding-and-abetting theory that likely does not survive the Supreme Court's decision in *Estados Unidos Mexicanos*. *See* JA527-32.

[4] On October 14, 2025, Judge Lisa Adubato of the Essex County Superior Court denied Glock's motion to dismiss. JA.896-918.

## 4. NSSF reopens its challenge.

Fearing that its other members—which include many New Jersey retailers similarly situated to Point Blank and Butch's, and many manufacturers with handguns similar in design to Glock's—would be the next targets, NSSF moved to reopen its lawsuit and amend its complaint to remedy the standing deficiencies this Court previously identified. JA.97-98. The district court granted the motion over the state's opposition, finding that NSSF and its members had experienced "both an extreme and unexpected hardship" given that "the representations made" to this Court "on behalf of the Attorney General as to NSSF's standing effectively 'precluded an adjudication on the merits.'" JA.108.

NSSF subsequently amended its complaint and filed a renewed motion for a preliminary injunction. JA.110; JA.151. In support, NSSF filed several declarations from members. NSSF-member retailers in New Jersey attested that, because of the A1765 actions against Point Blank and Butch's, they had begun "training [their] employees" to (try to) comply with the state's view that retailers must (try to) confirm that a purchaser of ammunition or magazines (but not a firearm) is not prohibited from possessing a firearm. JA.227, 256, 278, 314. These retailer members also attested that the time, money, and reputational harm that comes with enforcing that onerous and extra-legal obligation will never be recouped. JA.227-28, 257, 279, 314-15. In addition, manufacturer members attested that they make

and market "striker-fire pistols that are substantially similar in design to the Glock pistols" at issue in the *Glock* lawsuit. *E.g.*, JA.195; *see also* JA.204-05, 292, 299. Retailer and distributor members also attested that they fear enforcement actions under A1765 because they market and sell the very Glock pistols that the Attorney General claims have precipitated a public nuisance, JA.232-34, 240-42, 255-56, 262-64, 276, 284, 303-04, as well as AR-style rifles, "which numerous states and litigants have alleged can be illegally converted into machineguns" and so could form the basis of a suit "under A1765" under the exact theory the state is pursuing against Glock, JA.212, 219, 234, 285-86, 306.

> **5.** **The district court holds that it must abstain under *Younger* due to the suit against Glock.**

After all that, the district court refused to address the merits of any of NSSF's claims—but not because NSSF lacked Article III standing. On that issue, the court found "a strong threat of enforcement," considering that the state has sued "Glock[] and four other [industry members]" under A1765 "for allegedly lawful conduct," i.e., conduct not alleged to violate any law other than A1765's nebulous nuisance and negligence standards. JA.11. "Further bolstering the threat of enforcement" was the Attorney General's inability to explain "how [A1765] functions and what triggers [his] arguably selective enforcement, despite questioning by the Court for clarity at oral argument." JA.11 n.4.

Yet despite finding Article III satisfied, and despite the fact that NSSF sought to vindicate the rights of a diverse set of members, including retailers with interests unrelated to Glock's, the district court held that the state-court suit against Glock required it to abstain under *Younger*. In so holding, the court focused exclusively on the suit against Glock, paying no heed to NSSF's allegations regarding the new (but nowhere codified) obligations the state has imposed on retailers via the *Point Blank* and *Butch's* suits. JA.15-16. And despite this Court's conclusion that A1765 is "exclusively" and "purely civil [in] nature," 80 F.4th at 222, the district court deemed the *Glock* suit a "quasi-criminal" action, JA.17 & n.7. The district court also found that the "the Glock Suit is an ongoing judicial proceeding that was initiated prior to NSSF seeking to reopen the case," even though it was not initiated until years after NSSF filed this lawsuit, and even though the state secured dismissal of NSSF's original complaint by disavowing the exact kind of suits it is now bringing. JA.17. The court simply viewed all prior proceedings in this case as a "nullity." JA.18.

From there, the court concluded that the "Glock Suit" implicates "important state interests." JA.18. And because Glock's preliminary briefing in state court raised some of the same arguments that NSSF first raised years before in its initial federal complaint, the court reasoned that NSSF has "an adequate opportunity to present constitutional arguments" in the "state [court] proceedings." JA.18. While NSSF explained that Glock and NSSF are not the same parties and do not direct or

control each other's actions, the court nevertheless deemed them sufficiently "closely related" for *Younger* because Glock is a member of NSSF. JA.19. Although the court recognized that this Court has not accepted that sort of "derivative" theory of *Younger* abstention, it invoked out-of-circuit cases to support its intuition that the *Glock* suit somehow bars NSSF from asserting the interests of any of its 10,000 other members in federal court. *See* JA.19-20, 21 & n.10.

Finally, the district court questioned why NSSF had not intervened in the suit against Glock. JA.21-22. The court seemed to acknowledge that NSSF could not intervene as of right, but it suggested that permissive intervention may be available. 21-22 & n.11. That speculative option weighed heavily in favor of abstaining under *Younger*, the court held; on the flip side, the fact that NSSF represents the interests of thousands of members apart from Glock—again, including New Jersey retailers now firmly subject to a new legal regime codified nowhere—was of "little … substance" to the court. JA.22. So, despite voicing its "strong concerns about the problematic intersection between [A1765] and the PLCAA," the court concluded that "NSSF has failed to demonstrate a likelihood of success on the merits" because "*Younger* counsels abstention." JA.23. The court thus "DENIED" NSSF's renewed "application for a preliminary injunction," "instructed" "the Clerk's Office" "to ADMINISTRATIVELY TERMINATE this matter," and ordered the case stayed pending resolution of the *Glock* suit. JA.23-24.

## STANDARD OF REVIEW

This Court "exercise[s] plenary review over a trial court's … determination of whether *Younger* abstention is proper." *Smith & Wesson Brands, Inc. v. Att'y Gen. N.J.*, 27 F.4th 886, 890 (3d Cir. 2022) (ellipsis in original).

## SUMMARY OF ARGUMENT

"*Younger* is an 'exceptional' remedy to be invoked in only a narrow range of cases." *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 136 (3d Cir. 2014). Whatever the precise span of that range, this case falls far outside it. *Younger* "prohibits federal courts from hearing challenges to certain, 'exceptional' classes of ongoing state proceedings." *Argen v. Att'y Gen. N.J.*, 2022 WL 3369109, at *4 (3d Cir. Aug. 16, 2022) (footnote omitted). It does not, however, prohibit "parallel state and federal proceedings" over the same subject matter. *Sprint*, 571 U.S. at 81. That alone confirms that the district court erred here. NSSF is not a party to any state-court action under A1765. And while one of its 10,000-odd members is, NSSF is not seeking to enjoin or otherwise secure federal intervention in the *Glock* suit. Thus, *Younger* abstention should never have been on the table. That said, abstention would not be appropriate even if *Younger* were implicated. A1765 is not a "quasi-criminal" statute, and the *Middlesex* factors strongly counsel against abstention.

Moreover, even if this Court were to "conclu[de] that this situation formally fits within a *Younger* framework," that would "not end our abstention inquiry, for

*Younger* abstention is not always appropriate even if its elements are present." *Olde Disc. Corp. v. Tupman*, 1 F.3d 202, 212 (3d Cir. 1993). As things presently stand, NSSF has no avenue to raise its federal claims in a federal forum *or* in the *Glock* case—even though A1765 is "flagrantly and patently violative of express constitutional prohibitions," *Younger*, 401 U.S. at 53-54, and even though the Attorney General's promises not to bring actions like the *Glock* suit precluded NSSF from vindicating its members' constitutional rights the first time around. Abstaining here would reward the Attorney General's gambit of disavowing any intent to enforce A1765's nebulous standards against industry members for conduct not unlawful in itself, securing dismissal based on that representation, and then turning around and doing exactly what he said he would not. *Younger* abstention is designed to respect state courts, not to empower state actors to deprive federal-court plaintiffs of a federal forum in which to press federal claims. This Court should reverse.

## ARGUMENT

## I. The *Younger* Doctrine Is Categorically Inapplicable Here.

### A. This Suit Does Not Ask a Federal Court to Intercede in or Enjoin State Proceedings.

1. Federal courts have a "'virtually unflagging'" "'obligation' to hear and decide case[s]" over which they have jurisdiction. *PDX N., Inc. v. Comm'r N.J. Dep't of Lab. & Workforce Dev.*, 978 F.3d 871, 882 (3d Cir. 2020) (quoting *Sprint*, 571 U.S. at 77). After all, federal courts "have no more right to decline the exercise

of jurisdiction which is given, than to usurp that which is not given." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans* (*NOPSI*), 491 U.S. 350, 358 (1989) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

Those precepts do not fall by the wayside "simply because a pending state-court proceeding involves the same subject matter" or parties with similar interests. *Smith & Wesson*, 27 F.4th at 891 (quoting *Sprint*, 571 U.S. at 72). To be sure, the Supreme Court held in *Younger* that federal courts should typically decline "[r]equest[s]" by "federal-court plaintiff[s]" who are also "defendant[s] in a pending state criminal prosecution" "to enjoin the [state's] prosecution" against them. *Sprint*, 571 U.S. at 77; *see Younger*, 401 U.S. at 43-54. And the Court later "extended *Younger* abstention to particular state civil proceedings that are akin to criminal prosecutions," *Sprint*, 571 U.S. at 72, as well as "to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions," *NOPSI*, 491 U.S. at 368. But "there is no doctrine that … pendency of state judicial proceedings excludes the federal courts." *Id.* at 373. And rightly so, as to "suggest[] that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action" as a general matter "would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *Id.* at 368.

The Supreme Court has been explicit about this—and it has not been shy about policing overly aggressive abstention decisions. "In the years that followed" *Younger*'s extension "to some state civil proceedings," courts "expanded *Younger*" far beyond its proper moorings and were "abstain[ing] too frequently." *Smith & Wesson*, 27 F.4th at 890; *see also Jonathan R. v. Justice*, 41 F.4th 316, 328 (4th Cir. 2022) (discussing "this early era"). "[S]o the Supreme Court reined in that expansion," *Smith & Wesson*, 27 F.4th at 890, making clear in *Sprint* that "even in the presence of parallel state proceedings, abstention [remains] the 'exception,'" *Sprint*, 571 U.S. at 81-82 (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)), "to be invoked in only a narrow range of cases," *ACRA*, 748 F.3d at 136.

After "*Sprint* narrowed *Younger*'s domain," *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 462 (3d Cir. 2019), the first question a court now must ask when facing a *Younger*-abstention argument is whether exercising federal jurisdiction "risks the kind of interference *Younger* seeks to forestall: an interruption, an injunction, an end to the pending state proceedings," *Jonathan R.*, 41 F.4th at 334. If the answer to that question is yes—i.e., if ruling for the plaintiff will mean interrupting or ending state-court proceedings—then the Court must determine whether the pending state-court action fits within one of the "three categories" of

"exceptional circumstances" that "define *Younger*'s scope." *Id.* at 329 (quoting *Sprint*, 571 U.S. at 77-78).[5]

But if the answer to the threshold question is *no*—i.e., if the "specific relief" the federal plaintiff seeks in federal court would *not* interrupt, enjoin, or end state-court proceedings—then *Younger* has no role to play. *Id.* at 334. As this Court has explained, *Younger* "prohibits federal courts from hearing *challenges to* certain, 'exceptional' classes of ongoing state proceedings." *Argen*, 2022 WL 3369109, at *4 (emphasis added) (footnote omitted); *see also Borowski v. Kean Univ.*, 68 F.4th 844, 849 (3d Cir. 2023) (*Younger* serves "to prevent undue federal-court interference with [certain] state-level proceedings"). It does not prohibit federal-court litigation that does not challenge any state-court proceeding simply because the cases present similar issues. *NOPSI*, 491 U.S. at 373. Thus, when a federal suit does not challenge any state suit or request relief that would upset state proceedings, *Younger* is off the table.

2. Those principles suffice to foreclose *Younger* abstention here. Notably absent from the district court's opinion is any explanation of how adjudicating NSSF's lawsuit would interfere with the state-court suit against Glock. That omission is no oversight. NSSF never asked the court to enjoin or otherwise interfere

---

[5] The three categories are discussed *infra* at pp.34-46.

with the state-court action against Glock.  In fact, NSSF disclaimed any intention of having the court to "enjoin" or otherwise intervene in the *Glock* suit.  JA.822.  That is the end of the *Younger* road, as "*Younger*'s main concern has always been whether federal jurisdiction will 'unduly interfere' with pending state proceedings." *Jonathan R.*, 41 F.4th at 332 (quoting *Younger*, 401 U.S. at 44).  And a federal-court proceeding that simply presents the same legal questions as a pending state-court action does not interfere with the state-court proceeding at all.

Even the "fact that a judgment in the federal suit might have collateral effects in the state proceeding is not interference for *Younger* purposes." *Marks v. Stinson*, 19 F.3d 873, 885 (3d Cir. 1994).  After all, "parallel proceedings always involve a likelihood that a final merits judgment in one will effectively terminate the other." *Id.*  That is why *Sprint* made clear that "the pendency of an action in a state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." 571 U.S. at 73.  And it is why this Court has long held that "[a] federal plaintiff may pursue parallel actions in the state and federal courts so long as the plaintiff does not seek relief in the federal court that would interfere with the state judicial process." *Marks*, 19 F.3d at 885.  Indeed, the Supreme Court "noted in *NOPSI* that the federal proceeding [there] 'may well affect, or for practical purposes pre-empt, a … pending … state-court action,' yet still held *Younger* abstention inappropriate." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 71 (1st

Cir. 2005) (quoting *NOPSI*, 491 U.S. at 373). *A fortiori*, "the mere possibility of inconsistent results in the future is insufficient to justify *Younger* abstention." *Id.*

In short, NSSF is "not seeking to enjoin any state judicial proceeding"—it "simply desire[s] to litigate what is admittedly a federal question in federal court"—and, as a result, "the balance of state and federal interests tips decidedly away from abstention under *Younger*." *Marks*, 19 F.3d at 885 (quoting *Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n*, 791 F.2d 1111, 1117 (3d Cir. 1986)).

### B.     NSSF Is Not a Party to the State-Court Litigation Against Glock.

On top of that, "*Younger* abstention" generally "is inapplicable with respect to" a federal plaintiff that "is not a party to" any parallel state-court action. *Argen*, 2022 WL 3369109, at *5. "There is no ongoing proceeding involving [NSSF]," which "is not a party to the [*Glock*] matter" or any other suit under A1765. *Id.* *Younger* abstention is thus doubly inapplicable.

1. The district court "acknowledge[d]" that "this Circuit" has "found *Younger* inapplicable when" the federal "part[y]" is "different" from the state defendant. JA.20. And it cited no Third Circuit case reaching a contrary result, because there is none. Yet it brushed aside this Court's caselaw in favor of two out-of-circuit

decisions[6] and one unpublished district-court decision[7] that it read to support its intuition that NSSF and Glock must be joined at the hip for *Younger* purposes because NSSF invoked the *Glock* suit to support its Article III standing.  JA.19-21 & n.10.

Setting aside for the moment whether those non-binding decisions actually support that claim, this Court rejected that exact reasoning in *New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Education* (*NJPP*), 654 F.2d 868 (3d Cir. 1981).  There, New Jersey initiated an enforcement action against the directors and officers of Shelton College, alleging that it lacked the necessary licensing to operate under state law.  *Id.* at 871. Four Shelton students, two Shelton parents, one Shelton professor, and various affiliate churches then joined Shelton in bringing a federal action against the state. *Id.* at 870-71.  Each plaintiff raised constitutional challenges to the state's enforcement of the licensing regulations.  The churches argued that "the [state's] enforcement of the regulations deprive[d] them of their first and fourteenth amendment rights to minister to young adults through Shelton College; the students argue[d] that enforcement deprive[d] them of their first and fourteenth amendment

---

[6] *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874 (8th Cir. 2002), and *Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245 (8th Cir. 2012).

[7] *Burg v. Platkin*, 2024 WL 5198776 (D.N.J. Dec. 23, 2024).

rights to receive a Christian education; the parents assert[ed that] enforcement deprive[d] them of their first and fourteenth amendment rights to guide their children's choice of post-secondary education; [and] the teacher claim[ed that] enforcement deprive[d] him of his first and fourteenth amendment rights to 'pursue his religious ministry and Christian apostolate.'" *Id.* at 877-78.

Those claims were all directly downstream of the state's "enforcement" against Shelton. *Id.* at 877. Indeed, before "the commencement of the state's lawsuit against [Shelton]," *none* of the federal plaintiffs faced "a real threat of harm" sufficient for Article III. *Id.* Yet far from justifying equating the "no[n-]parties to [the] state court proceeding" with Shelton for *Younger* purposes—as the district court did here with Glock and NSSF—this Court concluded that the non-parties could proceed in federal court *precisely because* the state action confirmed that they faced a concrete risk of injury for Article III purposes. *Id.*

*NJPP* thus suffices to dispel the district court's dictum that "[i]t is inconsistent, and arguably disingenuous, for NSSF to rely on Glock for purposes of satisfying its Article III standing, but distance itself from Glock for the purposes of *Younger*." JA.21 n.10. In fact, it is entirely appropriate for NSSF to point to the lawsuits the Attorney General has brought to substantiate its members' fears that the Attorney General will bring more like them. Indeed, one of the reasons this Court found standing lacking the first time around is because A1765 had "not been

enforced against anyone, let alone [NSSF] or its members." 80 F.4th at 220. It is hard to see how NSSF could *ever* sue in federal court if it cannot establish a concrete threat of enforcement until its members are sued, yet is foreclosed from pursuing claims on behalf of *any* of its members as soon as the state sues one of them.

That is precisely why *NJPP* rejected the notion that Article III and *Younger* can be deployed as Scylla and Charybdis. *NJPP* expressly recognized that federal-court challenges will often come after state-court enforcement actions, because "[u]nless there is some pending enforcement proceeding against someone, the unrelated federal plaintiff may be dismissed on the ground that his suit is not ripe, or that he lacks standing." 654 F.2d at 880 n.19. And *NJPP* further recognized that "[a] federal plaintiff not the subject of a pending state enforcement proceeding cannot avoid interfering *in some way* with some pending state proceeding if he seeks to declare the underlying statute invalid, or to enjoin the state official from enforcing that statute." *Id.* (emphasis added). But, crucially, the Court concluded that such ephemeral "interfer[ence]" is not the sort with which *Younger* is concerned. Again, the mere fact of parallel litigation does not "'unduly interfere' with pending state proceedings" in the way that *Younger* contemplates. *Jonathan R.*, 41 F.4th at 332 (quoting *Younger*, 401 U.S. at 44); *accord Marks*, 19 F.3d at 885.

2. That is not to say *Younger* may never apply "when th[e federal] plaintiff" is nominally "a stranger to the state court proceeding." JA.19. But as *NJPP* makes

clear, "the contours of derivative preclusion in *Younger* cases" are strictly "limited." 654 F.2d at 878. Indeed, while the Supreme Court has "recognized" in dictum that there "may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them," JA.19 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928 (1975)), it has never actually applied such "derivative" *Younger* abstention.

In *Doran* itself, the Court explicitly rejected the argument that parties "unrelated in terms of ownership, control, and management" should be treated as "so closely related that they should all be subject to the *Younger* considerations which govern any one of them" just because they "have similar business activities and problems." 422 U.S. at 928-29. In fact, the Court went on to hold in *Doran* that because "[n]o state proceedings were pending against either Salem or Tim-Rob at the time," those federal plaintiffs—who did not own, control, or manage "M & L," the other party to the federal suit—"were entitled to have their claims for preliminary injunctive relief considered without regard to *Younger*'s restrictions." *Id.* at 930-31.

That distinction explains why (besides privileging out-of-circuit authority over this Court's on-point decision in *NJPP*) the district court erred in relying on *Cedar Rapids Cellular Telephone, L.P. v. Miller*, 280 F.3d 874 (8th Cir. 2002). *See* JA.19; n.6, *supra*. *Cedar Rapids* involved two federal plaintiffs in whom a state-court defendant ("U.S. Cellular") had "a controlling interest" and who would

therefore be subject to the remedy the state was seeking in the first-in-time state-court case. *Id.* at 882 ("The Attorney General's state court action seeks an injunction against 'all other persons, corporations and other entities acting in concert or participating with' U.S. Cellular."). The Eighth Circuit found *Younger* abstention appropriate there because if the "two [plaintiffs] obtain[ed] a federal injunction against action by the Attorney General, they could use that injunction to obstruct the Attorney General's attempts to enforce any remedy granted by the state courts" in its first-in-time action. *Id.* But, notably, the Eighth Circuit went on to hold that *Younger* did *not* apply as to a third federal plaintiff ("WWC"), even though WWC's "interests [were] generally aligned" with the state defendant, because it was not subject to the state defendant's control—which meant that WWC could not "use an injunction obtained in this federal action to interfere with the Attorney General's enforcement action against U.S. Cellular," and thus that WWC lacked "the type of close relationship with [the state defendant]" with which *Younger* is concerned. *Id.*

Here, Glock has no ability to direct or control NSSF's operations (and vice versa). Moreover, NSSF seeks to vindicate the rights of all its members, not the rights of Glock. *See* JA.822 (disclaiming any relief that would "enjoin" the *Glock* suit or any other "ongoing state court proceedings"); JA.844 (reiterating that "we're not here … seeking [relief] on behalf of Glock"). *Cedar Rapids* thus undermines, rather than supports, the decision below.

Lest there be any doubt about that, *Doran* erases it. After all, "[i]f two businesses were not barred from pursuing a federal suit despite having interests and representation in common with a state-court criminal defendant, as was the case in *Doran*, it is difficult to see how an industry association with some interests in common with a few of its members who are state-court civil defendants would be barred by *Younger* from pursuing its own federal suit." *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 43 (1st Cir. 2012).

In holding otherwise, the district court vastly overread *Tony Alamo Christian Ministries v. Selig* (*TACM*), 664 F.3d 1245 (8th Cir. 2012). *See* JA.19-20. In *TACM*, a church brought a federal lawsuit challenging the state's "seizure[]" "from [church] property" of "minor children" "who lived on [church] property." 664 F.3d at 1247. In that unusual setting, where the church's claims were "intertwined" with the parents' claims in a physical sense (the state came onto church property and removed children who lived there), the Eighth Circuit held that the fact that the church itself was not a party to the underlying proceedings in which "state courts adjudicated … the seized children to be dependent-neglected," *id.*, did not by itself render *Younger* abstention inapplicable as to the church, *id.* at 1251-54. That does not begin to support the district court's claim that *Younger* abstention applies "to an association who [i]s not a defendant in the pending state action" whenever "the association 'alleges standing based on injuries that are either directly or indirectly derivative of

29

those of the individual Plaintiffs.'" JA.19-20 (quoting 664 F.3d at 1253). And, of course, if the Eighth Circuit's decision in *TACM* really *did* stand for that broad proposition, then it would give way to this Court's decision in *NJPP*, which squarely rejected it. *See NJPP*, 654 F.2d at 880-81 & n.19; pp.24-26, *supra*.

As for *Hicks v. Miranda*, 422 U.S. 332 (1975), the district court simply misread that decision. *See* JA.19. In the district court's telling, the Court in *Hicks* "abstain[ed] under *Younger* despite the fact that the federal plaintiff was not a defendant in the state court action because the federal plaintiff's interests were intertwined with the state defendant's interests." JA.19. That is just plain wrong. To be sure, "no state criminal proceedings were pending against [the federal plaintiffs] by name" "[w]hen they filed their federal complaint." *Hicks*, 422 U.S. at 348. (The federal plaintiffs were an adult-film theater and its owners; they sued after "two employees of the theater had been charged" with displaying an obscene movie (Deep Throat) "and four copies of 'Deep Throat' belonging to [the theater] had been seized." *Id.*) But that was only part of the story. Shortly after filing their federal complaint—and "prior to any proceedings whatsoever before the three-judge court"—the federal plaintiffs "were charged along with their employees in Municipal Court." *Id.* at 349-50. *That* was why *Younger* abstention applied: "[S]tate criminal proceedings [had] begun *against the federal plaintiffs* … before

any proceedings of substance on the merits ha[d] taken place in the federal court." *Id.* at 349 (emphases added).

Furthermore, the federal suit in *Hicks* sought "an injunction ordering the return of all copies of the film" at issue in the state-court proceeding. *Id.* at 338. "[T]he federal action" was thus not merely parallel to an ongoing state criminal proceeding against related parties; it specifically "sought to interfere with the pending state prosecution." *Id.* at 349. That is worlds away from this case. And not even that was enough to justify application of *Younger* abstention in *Hicks*. The Supreme Court suggested that *Younger* abstention would *not* have applied in *Hicks* if the federal plaintiffs had not been added to the state criminal case and thus found themselves unable to "seek the return of their property in the state proceedings." *Id.* But the Court ultimately was spared from reaching that issue, because the federal plaintiffs *were* state-court defendants by the time the federal case got underway.

3. As all that makes clear, *Younger* abstention is not even arguably applicable here. *Contra* JA.19, NSSF and Glock are not so "intertwined" that the state's enforcement action against Glock precludes NSSF (and all its members) from raising their federal challenges to A1765 in federal court. NSSF does not own, manage, employ, or control Glock. *See Doran*, 422 U.S. at 928-31. Glock's defense in state court is in no way dependent on its status as an NSSF member. No relief NSSF is seeking here would interfere with the state-court civil suit against Glock. And while

the fact that the state has enforced A1765 against Glock (and Butch's, Point Blank, etc.) confirms that NSSF has standing, this federal lawsuit—which long predates the state's *Glock* suit—has never been about Glock. It is about the rights of the many thousands of members NSSF has, in and out of New Jersey, that A1765 targets.

The district court nonetheless analyzed the matter as if NSSF had filed suit solely (or principally) on behalf of Glock. *See* JA.21-22. Nothing could be further from the truth. NSSF filed this lawsuit *years before* the Attorney General sued Glock. NSSF filed suit on behalf of all of its members, not just (or even principally) Glock. And, again, after the district court granted NSSF's motion to reopen, NSSF explicitly disclaimed any intent to have the district court intercede in the *Glock* suit, *see* JA.822; JA.844. To be clear, NSSF is seeking to vindicate the rights of many of its 10,000 *other* members, several of whom supplied declarations detailing how the state's recent A1765 actions—including, most notably, the *Butch's* and *Point Blank* cases, *see* pp.13-14, *supra*—threaten to harm or are already harming their businesses. NSSF-member retailers attested that, because of those *other* A1765 suits, which have nothing to do with Glock, they have lost unrecoverable money trying to comply with the new-but-nowhere-codified view those suits impose, under

which retailers must (somehow) confirm that ammunition or magazines purchasers are not prohibited from possessing firearms.  JA.227-58, 256-57, 278-79, 314-15.[8]

The district court simply ignored all of that.  To be sure, it recognized at oral argument that the *Butch's* and *Point Blank* cases confirm that, under A1765, "the Attorney General tomorrow can decide that something needs to be done within the reasonable control, even though it's not required by law, [and] that can cause an issue for [NSSF] members because now they're having to comply with a moving target that can change at any point."  JA.888.  Yet in its opinion denying NSSF's motion on *Younger* grounds, the court did not even mention the distinct injuries that retailers stand to suffer and are suffering.  That is inexplicable.  The injuries NSSF's retailer-members are suffering on account of those separate enforcement actions have nothing to do with the *Glock* case; those injuries are not derivative of Glock's injuries at all.  And they could not even arguably be asserted in the *Glock* case, since that case has nothing to do with the "reasonable controls" that licensed firearm retailers must implement under A1765.  *See* pp.11-12, *supra* (discussing *Point Blank* and

---

[8] That distinguishes this case from *Burg v. Platkin*, 2024 WL 5198776 (D.N.J. Dec. 23, 2024), on which the district court relied, *see* JA.19; n.7, *supra*.  There, Burg was both the lead federal plaintiff and the sole defendant in the underlying state proceeding.  2024 WL 5198776, at *6 n.5.  And while his federal co-plaintiff, the Association of New Jersey Rifle & Pistol Clubs, Inc. ("ANJRPC"), of which he was a member, was not involved in the state proceeding, the only state "proceeding that ANJRPC complain[ed] about [wa]s the one pending against Burg."  *Id.*

*Butch's* cases). For that reason alone, the district court's analysis cannot withstand scrutiny.

In short, under a straightforward application of binding precedent, this is not a close call: *Younger* abstention is not applicable here.

## II. The District Court's (Mis)application Of *Younger* Fails On Its Own Terms.

Even if *Younger* were on the table, it would not be appropriate here. *Younger* abstention extends no further than "(1) 'state criminal prosecutions'; (2) 'civil enforcement proceedings'" that are "akin to a criminal prosecution"; "and (3) 'civil proceedings involving certain orders'" like contempt "uniquely in furtherance of the state courts' ability to perform their judicial functions." *Smith & Wesson*, 27 F.4th at 891 (quoting *Sprint*, 571 U.S. at 72, 78-79, 82). Even if a state proceeding "fits one of those" three categories, moreover, a federal court must still "consider *Middlesex*'s '*additional* factors'" before abstaining. *Malhan*, 938 F.3d at 462 (quoting *Sprint*, 571 U.S. at 81-82); *see Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

"This appeal does not involve a pending state criminal prosecution, so the first *Younger* category is inapplicable." *Smith & Wesson*, 27 F.4th at 891. Nor does it seek to set aside any state-court order, let alone any order (such as a contempt order) "*uniquely* in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 893 (quoting *Sprint*, 571 U.S. at 78). The district court did not

dispute that. Nevertheless, it deemed the enforcement action against Glock "quasi-criminal" and then found the *Middlesex* factors to favor abstention. That was wrong.

## A.      The Suit Against Glock Is Not "Quasi-Criminal."

"To qualify" for *Younger*, a civil "state action must be 'akin to a criminal prosecution in important respects.'" *Id.* at 891 (quoting *Sprint*, 571 U.S. at 79). But as this Court explained last time around, A1765 is "purely" and "exclusively civil." 80 F.4th at 222. Those statements were not obiter dicta. The "purely civil nature" of A1765 was a "[p]lus" factor that "bolstered" this Court's "holding that" the "risk of enforcement" NSSF members faced as of 2023 (before the wave of enforcement actions began) was too "attenuated" to establish "Article III standing." *Id.* To state what should be obvious, a "purely" and "exclusively civil" statute is not criminal, or even quasi-criminal.

The district court acknowledged this Court's repeated recognitions that A1765 is "civil" only, but waved them away because they arose in the context of "analyzing the risk of enforcement to NSSF and the ripeness of their case," rather than in the context of *Younger*. JA.16-17. That is a non-sequitur. A statute is purely civil or it is not; it cannot be purely civil for standing purposes but quasi-criminal for abstention purposes. And this Court concluded that A1765 is "purely civil," full stop.

At any rate, whatever may be said about A1765 itself, the *Glock* suit is plainly not quasi-criminal. To qualify as "quasi-criminal" for *Younger* purposes, a state-court action must "bear a close relationship to proceedings criminal in nature"—i.e., it must be "'akin to a criminal prosecution' in 'important respects.'" *Sprint*, 571 U.S. at 79. It is not enough that an action was "commenced by the State in its sovereign capacity" following "a preliminary investigation that culminated with the filing of formal charges." *ACRA*, 748 F.3d at 138. It must also have been "initiated to sanction the federal plaintiff for some wrongful act." *Id.* And the A1765 claims against Glock do not satisfy that criterion. Quasi-criminal proceedings that "sanction[]" state-court defendants are "retributive in nature"; they seek "to punish the sanctioned party 'for some wrongful act.'" *Id.* at 140 (quoting *Sprint*, 571 U.S. at 79). The A1765 claims against *Glock*, on the other hand, sound in public nuisance. *See* N.J.S. §2C:58-35(a)(1)-(3). And "an action to abate a public nuisance" is not "punitive." *Tull v. United States*, 481 U.S. 412, 423 (1987); *see also* Restatement (Second) of Torts §821B (1979).[9]

---

[9] *Contra* JA.17 n.7, *Huffman v. Pursue*, 420 U.S. 592 (1975), did not hold that "nuisance statutes are 'closely related to criminal statutes.'" There, "the state filed a complaint against a theater company for violating the obscenity provisions of a nuisance statute, and it sought to sanction the theater by forcing its closure and seizing and selling its personal property." *ACRA*, 748 F.3d at 141 (discussing *Huffman*). As the Supreme Court explained, the state action was "both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials." *Huffman,* 420 U.S. at 604. Here, in contrast, "there is no indication that the policies implicated in the state proceeding" against Glock "could have been

To confirm that reality, one need only read the *Glock* complaint. New Jersey seeks to make Glock pay to redress harms caused by third-party criminals based on the design, manufacture, marketing, and sale of Glock's (still-to-this-day) lawful handguns. *See, e.g.*, JA.745-47, 753-55. The Attorney General does not accuse Glock itself of any criminal activity. Nor does it demand punishment for Glock's purportedly wrongful conduct. It instead requests the civil remedies of "injunctive relief[,] … abatement, and restitution." *See, e.g.*, JA.700, 747, 749, 751, 753, 755, 757. Indeed, New Jersey's action against Glock is not even confined to "wrongful acts": The state's very first cause of action in the *Glock* suit seeks "abatement and restitution" for conduct that *is not unlawful in itself*. JA.745-47. If a tort suit for restitution and abatement predicated on not-unlawful conduct is "quasi-criminal," then so is practically every civil action brought by the state in tort. *But see Sprint*, 571 U.S. at 82 (*Younger* is the "exception," not the "rule").

Of course, from the perspective of an industry member subjected to an A1765 enforcement action, the suit may well feel like a form of punishment for lawful commerce in arms. But while an injunction against the sale of its lawful and most-popular handguns would no doubt produce "negative consequences" for Glock's

---

vindicated through enforcement of a parallel criminal statute," which further undermines the district court's application of *Younger*. *See ACRA*, 748 F.3d at 139.

business (and for the Second Amendment rights of law-abiding American citizens), as would an order requiring abatement and restitution, "negative consequences are not the same thing as sanctions" under *Younger*. *ACRA*, 748 F.3d 127 at 140. The district court's single-sentence analysis to the contrary, *see* JA.17, is simply wrong.

As for whether the *Glock* suit has "other similarities to criminal actions, such as a preliminary investigation that culminated with the filing of formal charges," *ACRA*, 748 F.3d at 138, the district court again said very little—noting only that the "complaint" makes clear that New Jersey "investigated Glock … while using resources similar to those used in a criminal enforcement action." JA.17. But nowhere in the *Glock* complaint did the Attorney General indicate that he or his office conducted anything like a "robust" criminal investigation prior to filing suit. *See Smith & Wesson*, 27 F.4th at 891-92. And while New Jersey certainly filed a complaint in state court alleging that Glock violated A1765, that cannot be enough to bring a state case within *Younger*'s ambit. If the mere gathering of facts in a civil complaint is akin to a robust criminal investigation, then it is a mystery what kind of state-court proceedings would not satisfy *Younger*'s quasi-criminal inquiry.

**B.     NSSF Lacks an Adequate Opportunity to Raise Its Claims in the Action Against Glock, Which Postdates This Case in All Events.**

Because NSSF is not seeking to enjoin any state-court proceeding and is not a party to the *Glock* suit, which is not a "quasi-criminal" enforcement action in all events, the "*additional* factors" discussed in *Middlesex* are neither here nor there.

*Sprint*, 571 U.S. at 81; *see Smith & Wesson*, 27 F.4th at 895. After all, as *Sprint* made crystal clear, to allow the "*Middlesex* conditions" to justify abstention "[d]ivorced from their quasi-criminal context" would extend *Younger* "to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest"—in defiance of the "dominant instruction that, even in the presence of parallel state proceedings, abstention … is the 'exception, not the rule.'" 571 U.S. at 81-82 (quoting *Haw. Hous. Auth.*, 467 U.S. at 236).

That said, the district court's application of the *Middlesex* factors, *see* JA.17-23, cannot withstand scrutiny. When a state-court proceeding is "quasi-criminal," *Middlesex* directs federal courts to consider: "(1) whether there are 'ongoing judicial proceeding[s]'; (2) whether those 'proceedings implicate important state interests'; and (3) whether there is 'an adequate opportunity in the state proceeding to raise constitutional challenges.'" *PDX*, 978 F.3d at 883 (alteration in original) (quoting *Middlesex*, 457 U.S. at 432). Regardless of the state's interest in A1765 or the *Glock* case, the first and third considerations strongly counsel against abstention here.

### 1. There were no "ongoing judicial proceedings" in state court under A1765 when NSSF filed this lawsuit.

"*Younger* is inextricably bound up with beginnings," *Hill v. Snyder*, 878 F.3d 193, 205 (6th Cir. 2017); abstention is generally appropriate only when the state-court lawsuit is filed first. That alone forecloses abstention here, as it is this lawsuit, not the *Glock* suit, that came first. NSSF filed its initial complaint in this case all

the way back in 2022, D.Dkt.1, and the state did not file the *Glock* lawsuit until 2024—a year-and-a-half after the district court granted NSSF's initial preliminary-injunction motion, and still more than a year after this case made its way through appeal proceedings in this Court (and back down). *See* JA.27, 692.

To be sure, *Younger* may be appropriate as to first-in-time federal actions if no "proceedings of substance on the merits ha[d] taken place" before the state-court action got underway. *Hicks*, 422 U.S. at 349. But between its initiation back in 2022 and the filing of the *Glock* suit in 2024, this case developed well past its "embryonic stage." *Doran*, 422 U.S. at 929. The district court granted a preliminary injunction, JA.27, which remained in place in relevant part for the better part of a year, *see* 80 F.4th 215; CA3.No.23-1214.Dkt.16. And while this Court later held that more standing allegations were necessary, that does not change the fact that "[w]e are far from the beginning of this case, the initiation of which is barely discernible in our rearview mirror." *Hill*, 878 F.3d at 205.

The district court nonetheless narrowed the lens and wiped the slate clean, deeming all the prior proceedings in this case a legal "nullity" because this Court held that NSSF lacked standing when the case was last on appeal. JA.18. That sort of "callous disregard for the meaningful litigation that has already occurred in the federal court system" finds no support in *Younger* or its progeny—or anywhere else, for that matter. *Hill*, 878 F.3d at 206. Indeed, under the district court's rule, curative

amendments to complaints would be traps for the unwary, and "subsequent unforeseen prosecutions [could] cut the legs out from under long-running federal litigation" even when the state-court proceeding is against someone other than the federal plaintiff. *Id.* at 205. That likely explains why most courts, including this one, have squarely rejected that approach. *See, e.g.*, *Tokyo Gwinnett, LLC v. Gwinnett Cnty.*, 940 F.3d 1254, 1270 (11th Cir. 2019); *Hill*, 878 F.3d at 205-07.

Consider *Tucker v. Ann Klein Forensic Center*, 174 F.App'x 695 (3d Cir. 2006). The district court there "dismissed" the "federal action … as legally frivolous"; "[o]n appeal," this Court mostly affirmed but reversed and remanded "for consideration of [a few non-frivolous] claims." *Id.* at 697. "[O]nly after all" that was the state-court case filed. *Id.* at 697-98. Given those facts, this Court had no trouble holding that the "federal action had progressed beyond the point at which *Younger* abstention could properly be invoked." *Id.* at 698.

This case, where the court *granted NSSF's preliminary injunction motion* last time around, follows *a fortiori*. To put it mildly, both parties have done more than just "beg[i]n actively litigating [their] position[s] in federal court." *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1218-19 (11th Cir. 2002). This action, which has already been up on appeal on the merits, thus fits comfortably within the long line of cases that have rejected requests to abstain under *Younger* from resolving a first-in-time federal suit. *See, e.g.*, *id.* at 1213-14, 1220 (reversing

decision to abstain when parties were in the midst of briefing two motions on the merits and court had resolved a motion for a temporary restraining order after an evidentiary hearing); *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 729-30 (9th Cir. 2017) (abstention under *Younger* was an abuse of discretion when federal actions had been pending for approximately six months and district court had considered briefing on a motion to dismiss and preliminary injunction involving the merits).

What is more, the district court's theory that this case did not begin for *Younger* purposes until NSSF amended its complaint turns relation-back principles upside-down. Under the relation-back doctrine, "a complaint 'relates back to the date of the original pleading when … [it] asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.'" *T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 327 (3d Cir. 2019) (quoting Fed. R. Civ. P. 15(c)(1)(B)). If an amended complaint satisfies that standard, "'relation back is mandatory,' and not subject to additional equitable considerations." *Id.* Here, NSSF's amended complaint inarguably relates back to its initial complaint. The two are nearly identical; the only difference is that NSSF's amendment cured the standing and ripeness problems this Court identified last time around. *See* pp.13-14, *supra*; JA50-91; *see also T Mobile*, 913 F.3d at 328 ("[R]elation back may be used to cure defects in jurisdictional allegations."). Thus,

far from "nullifying" its initial filing or the significant proceedings conducted in this federal case to date, NSSF's amended complaint marked the continuation of this case in federal court, which began long before the Attorney General filed the *Glock* suit in state court. Because the *Glock* suit was not ongoing when NSSF filed this lawsuit, it cannot trigger *Younger*.

### 2. NSSF lacks anything close to an "adequate opportunity" to assert its claims in the *Glock* suit.

Even if the initial round of proceedings in this case were now a "nullity," the final *Middlesex* consideration—whether NSSF would have an adequate opportunity to raise its constitutional challenges in the *Glock* suit—would still counsel against abstention. In holding otherwise, the district court observed that "Glock raises constitutional arguments nearly identical to those presented by NSSF in this case." JA.18. But that is the wrong question. The "pertinent inquiry" under *Middlesex* is not whether the state court will *address* the same issues, but "whether the *federal plaintiff* has an adequate opportunity to present the federal challenge" in the state-court proceeding. *Middlesex*, 457 U.S. at 432, 434 (emphasis added). The answer here is plainly no. Even if this Court thought that NSSF and Glock were closely related parties for purposes of *Younger*'s threshold analysis, *but see* Part I.B., *supra*, NSSF cannot raise its own challenges via Glock because NSSF does not control Glock's legal defense in the state action. Furthermore, even if NSSF had some ability to direct Glock's litigation (which, again, it does not), that still would not

43

suffice, since Glock could not obtain an NSSF-member-wide injunction against enforcement of A1765 via a motion to dismiss the state's suit against Glock.

The district court seemed to recognize at least some of those problems, and so posited that NSSF could solve them by intervening. JA.18-20. That is both wrong and irrelevant. First, it is far from clear that permissive intervention is even available in the *Glock* suit (or was when it began), let alone that NSSF could intervene to seek the member-wide relief it seeks in federal court. After all, courts do not typically let third-parties intervene in government enforcement actions to press affirmative challenges, and "no authority suggest[s] that intervention [in the *Glock* suit] would be any more welcome … than in a criminal prosecution." *NJPP*, 654 F.2d at 882. And to the extent permissive intervention *is* available, that would only undermine any claim that those proceedings are "quasi-criminal." *See* pp.35-38, *supra*.

But that aside, this Court has thoroughly rejected the notion that *Younger* obligates federal-court plaintiffs to intervene in state-court cases that might implicate their federal claims instead of pursuing them in federal court. In *NJPP*, for instance, New Jersey argued that the federal plaintiffs should "intervene in [the] pending state[-court] proceeding [against Shelton] in order to litigate their own separate rights." 654 F.2d at 882. The Court resoundingly rejected that argument. *Id.* at 882-84. The Court subsequently reaffirmed that rejection in *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834 (3d Cir. 1996), where it did not mince words:

"[N]othing in *Younger* or the cases following it suggests that persons claiming a violation of their federal rights have an obligation before turning to federal court to see whether there is some state court proceeding they might join in order to present their federal claims there." *Id*. at 844 (quoting *Hoover v. Wagner*, 47 F.3d 845, 848 (7th Cir. 1995)). The law of this Circuit is clear. "Because [it] is not subject to an ongoing state proceeding," NSSF "does not have the opportunity to present its constitutional claims" for *Younger* purposes. *PDX*, 978 F.3d at 887.

The district court's reasoning not only is foreclosed by Third Circuit precedent, but is fundamentally antithetical to *Younger* itself—as this Court (again) explained in *NJPP*. The Supreme Court's "primary motivation in its adoption of the *Younger* doctrine was the insulation of state enforcement of its criminal law from litigious interruptions." *NJPP*, 654 F.2d at 882. "Even when the doctrine was extended to certain civil cases, that step was justified because of the close relationship of those cases to state penal policies." *Id.* And "neither New Jersey nor any other state would permit third parties to intervene and participate in criminal prosecutions." *Id.* That explains why the Supreme Court has consistently made clear that, absent special circumstances not present here, "a federal forum is available to litigants threatened with violations of federally protected rights and not presently parties to a state court proceeding." *Id.* To impose a state-court-

intervention requirement on federal plaintiffs would eviscerate that federal-law protection.

In sum, the mere possibility that a federal plaintiff could intervene in a state-court action against someone else does not provide an "an adequate opportunity in the state proceeding[] to raise constitutional challenges." *Middlesex*, 457 U.S. at 432.

## III. Federal Intervention Is Necessary Here To Prevent Irreparable Harm And To Ensure That Gamesmanship Is Not Rewarded.

In *Younger*, the Supreme Court ended its opinion by noting that even where the prerequisites for abstention seem to be met, "unusual situations" could nonetheless justify "federal intervention." 401 U.S. at 54. This Court has taken that caveat to heart. *See, e.g.*, *Olde Disc. Corp.*, 1 F.3d at 212-15. And this is precisely the kind of unusual situation where *Younger* abstention would be inappropriate even if it might be available.

1. When this case was last on appeal, "representations made" to this Court "on behalf of the Attorney General as to NSSF's standing effectively 'precluded an adjudication on the merits.'" JA.108. Indeed, had the Attorney General *not* "disavowed prosecuting [NSSF] members just for participating in 'lawful commerce,'" 80 F.4th at 221, i.e., conduct that is not "unlawful in itself," N.J.S. §2C:58-35(a)(1), NSSF's federal claims may well have been adjudicated in federal court and reached final judgment long before the *Glock* suit (or any other A1765

46

enforcement action) was filed. Alternatively, had the Attorney General stayed true to his word, then NSSF never would have reopened. But when the Attorney General defied those representations, initiating a series of enforcement actions that made the threat of enforcement clear beyond cavil, NSSF quickly moved to reassert its members' federal rights.[10]

Yet, under the decision below, NSSF is now precluded from litigating its federal claims in federal court on behalf of *any* of its 10,000-odd members. It simply cannot be that NSSF lacked standing to challenge A1765 before the Attorney General enforced (or expressly threatened to enforce) it against an NSSF member, *see* 80 F.4th at 220-21, but is precluded under *Younger* from challenging A1765 as soon as the Attorney General initiates even a single enforcement action against one of NSSF's members. Neither standing doctrine nor abstention doctrine creates that kind of Catch-22.

2. On top of that, A1765 is "flagrantly and patently violative of express constitutional prohibitions." *Younger*, 401 U.S. at 53-54 (noting that abstention would be inappropriate when a state law fits that bill). As the district court held the

---

[10] That suffices to dispel the district court's accusation of forum shopping. *See* JA.22 n.12. Indeed, the district court itself recognized that reopening would "serve the interests of judicial economy, reduce wasted time, and ultimately help avoid unnecessary burdens on the parties and the Court," because "a new filing would result in a new complaint[,] and a new motion for a preliminary injunction and be a related matter that would be assigned to the [same judge]." JA.108.

first time around, A1765 "is in direct conflict with the PLCAA's purpose," as it clearly "subject[s] manufacturers, distributors, dealers, and importers of firearms or ammunition products and their trade associations to civil liability for the harm solely caused by the criminal or unlawful misuse of firearm or ammunition products by others." JA.39-40. And while this Court vacated that decision, it did so only because it held that NSSF lacked standing at the time. 80 F.4th at 217-18. Nothing has changed in the law that would alter the district court's holding on the likely merits— as confirmed by the court's felt need even as it abstained to "express[] its strong concerns about the problematic intersection between [A1765] and the PLCAA." JA.23.

And A1765's direct conflict with the PLCAA is not even the half of it. While A1765 suffers from a number of constitutional defects, arguably the most glaring violations arise from the statute's restrictions on constitutionally protected speech. Under A1765, a manufacturer or seller of firearms and related products may be held liable for a broad range of legal and equitable remedies if a state court deems its "marketing of a gun-related product" to be "unreasonable" (but not "unlawful") and finds that it "contribute[d]" to "any condition which … contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience" of the public. N.J.S. §§2C:58-34, 2C:58-35(a)(1). An industry member may also be held liable if a state court determines that it failed to "establish, implement, and enforce

reasonable controls regarding its … marketing of gun-related products." *Id.* §2C:58-35(a)(2). A1765 thus allows licensed manufacturers and sellers of firearms and related products to be held liable in tort, and made to pay to redress harms caused by third parties who misuse their lawful products, based on the not-unlawful promotion of their not-unlawful products under nebulous state-law "reasonableness" standards.

That is not remotely consistent with the First Amendment. Truthful speech promoting lawful products is protected by the First Amendment even if the product is known to have deleterious health effects. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (tobacco); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184-85 (1999) (gambling); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504 (1996) (liquor); *Bigelow v. Virginia*, 421 U.S. 809, 818-25 (1975) (abortion). The mere fact that a product is dangerous does not transform promotion of that product into a tort for which liability may be imposed. That is true *a fortiori* when it comes to products that are not only legal, but protected by the Second Amendment. *See, e.g.*, *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1116-17 (9th Cir. 2023) (invalidating similar marketing restriction). A1765 thus strikes at the heart of the First Amendment.

Making matters worse, the statute makes it virtually impossible for regulated parties to tell what speech is and is not permitted, leaving them with no realistic choice but to err on the side of refraining from exercising their First Amendment

rights. By its terms, A1765 renders unlawful any marketing that could be said to have "recklessly" "contribute[d] to a public nuisance," even if the marketing is *not* "unlawful," N.J.S. §2C:58-35(a)(1), and it defines "public nuisance" so broadly as to sweep in, e.g., truthful marketing that "contributes to the injury or endangerment of the health, safety, peace, comfort, or convenience of others" or is not subject to sufficiently "reasonable procedures, safeguards, and business practices," *id.* §2C:58-34. A1765 thus necessarily "will provoke uncertainty among speakers," *Reno v. ACLU*, 521 U.S. 844, 871 (1997), as such incomprehensible and subjective abstractions do not articulate at all—let alone articulate with "narrow specificity"— what kind of speech may later be deemed to have contributed to a "public nuisance." Any advertisement for a lawful product anywhere, even wholly outside New Jersey, can be grounds for liability if it is later deemed to have indirectly *contributed* to gun-related problems in New Jersey. By contrast, the "legitimate" sweep of the statute's marketing provisions is miniscule—particularly given that A1765 elsewhere contemplates full compliance with state and federal laws relating to marketing of firearms. *See* N.J.S. §2C:58-34. A1765's vague command to speak "reasonably" is all but certain to chill constitutionally protected speech.

That profound uncertainty not only "raises special First Amendment concerns because of its obvious chilling effect on free speech," but creates a "risk of discriminatory enforcement," which makes the chilling effect even more acute.

*Reno*, 521 U.S. at 871-72. A1765 threatens liability for any marketing that the state could later say was not subject to "reasonable controls." But under our constitutional framework, the state does not get to decide, after the fact, whether speech was reasonable. Unless commercial speech is false or inconsistent with traditional, clear, and ex ante restrictions on speech, the First Amendment protects it, even if others might deem the speech "unreasonable." And the threat of discriminatory enforcement is all the more pervasive when, as here, a law "does not aim specifically at evils within the allowable area of State control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). That inherent vagueness dooms A1765 under the First Amendment as well.

Moreover, even when speech about a product is actually false or misleading, the traditional principles that govern judicial actions for misrepresentations, including proof of reliance, have always required a substantial link between the speech and the claimed injury. *See, e.g.*, Restatement (Second) of Torts §525 (1977). Indeed, if liability could be imposed for misleading (or even truthful) speech at the behest of plaintiffs who did not rely on it and cannot demonstrate injury from it, then the threat of massive liability could inhibit a speaker from voicing his view "even though [he] believe[s] [it] to be true and even though it is in fact true." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Yet A1765 does not even require proof

of reliance.  Nor does it require a plaintiff to trace alleged injuries directly to the speech in question.  Under A1765, an industry member's speech is simply "deemed to constitute a proximate cause of the public nuisance if the harm to the public was a reasonably foreseeable effect of such conduct, notwithstanding any intervening actions, including, but not limited to, criminal actions by third parties."  N.J.S. §2C:58-35(e).  The First Amendment demands more, particularly of content- and speaker-based restrictions on speech.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011).

3. A1765 is "flagrantly and patently violative of" the First Amendment. *Younger*, 401 U.S. at 53-54.  Yet in the *Glock* suit—which, under the decision below, precludes NSSF from raising its First Amendment (and other) challenge(s) *at all*— the trial court swatted away Glock's First Amendment defense on the theory that "the Complaint [there] is based on conduct—design, manufacturing, and distribution decisions—not speech."  JA914.  To be sure, the state court went on to add one sentence addressing the issue on the merits—but what it said about the First Amendment was beyond the pale.  According to the state court in *Glock*, "[a]ny restriction" on marketing "is justified by the substantial government interest in preventing public nuisance."  JA.914  If that were really the law, then the First Amendment would be worth little more than the paper it is printed on.  Thankfully,

federal courts are not so quick to uphold restrictions on speech based on vague notions of what judges (or legislatures) believe is in the public interest.

Against that backdrop, denying NSSF a federal forum in which to raise its federal constitutional claims would constitute irreparable harm of the highest order. "[Dismissal under *Younger*] naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." *Borowski*, 68 F.4th at 854 (alteration in original) (quoting *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973)). But NSSF has no opportunity to press its claims in the *Glock* case. Thus, "even assuming the state proceedings here are the sort to which *Younger* applies," it would still be "not appropriate" to abstain, as NSSF and its myriad members "will 'suffer irreparable injury' absent" federal intervention. *NOPSI*, 491 U.S. at 366 (quoting *Younger*, 504 U.S. at 43-44). For all these reasons and more, NSSF is entitled to its "choice of a [federal] forum." *NJPP*, 654 F.2d at 883.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

s/Erin E. Murphy

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, PC
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040

ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellant*

October 28, 2025

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the attorney whose name appears on the Brief of Appellant was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit in 2013, and is presently a member in good standing at the Bar of said court.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a). Specifically, this brief contains 12,937 words in 14-point Times New Roman font.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program SentinelOne, version 22.2.4.558, has been run on the file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin Murphy