No. 25-2546

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

NATIONAL SHOOTING SPORTS FOUNDATION,
                                    *Plaintiff-Appellant,*

v.

ATTORNEY GENERAL OF THE STATE OF NEW JERSEY,
                                    *Defendant-Appellee,*

_____

Appeal from the United States District Court for the
District of New Jersey; No. 3:22-cv-06646
_____

## BRIEF OF APPELLEE
_____

> MATTHEW J. PLATKIN
> *Attorney General of New Jersey*
>
> JEREMY M. FEIGENBAUM
> *Solicitor General*
>
> MICHAEL L. ZUCKERMAN
> *Deputy Solicitor General*
>
> TIM SHEEHAN
> *Assistant Attorney General*
>
> NAIMA DRECKER-WAXMAN
> JONATHAN B. MANGEL
> *Deputy Attorneys General*

Office of the New Jersey
Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(862) 350-5800
tim.sheehan@njoag.gov
*Attorneys for Appellee*

**TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ....................................................................1

COUNTERSTATEMENT OF JURISDICTION ........................................4

COUNTERSTATEMENT OF THE ISSUE PRESENTED......................4

RELATED CASES AND PROCEEDINGS ...............................................4

COUNTERSTATEMENT OF THE CASE..................................................4

    A.      PLCAA. ................................................................4

    B.      Section 35. ...........................................................6

    C.      *NSSF I*................................................................8

    D.    Section 35 State-Court Enforcement Actions. ..................12

    E.    Proceedings Below............................................17

SUMMARY OF ARGUMENT ...............................................................21

STANDARD OF REVIEW....................................................................24

ARGUMENT ......................................................................................24

  I. The District Court Rightly Abstained As To The *Glock* Suit.........25

    A.    *Younger* Bars NSSF's Collateral Attack On The *Glock* Suit. 25

        1. The *Glock* Suit Is A Covered Civil Enforcement Action Akin To A Criminal Action In The Relevant Respects..................27

        2. The *Middlesex* Factors Likewise Support Abstention..........32

i

3.  None Of *Younger's* Narrow Exceptions Applies. ...................46

B.  *Brillhart-Wilton* Also Requires Federal Courts To Abstain. 53

II. NSSF Cannot Avoid Abstention Through Its Other As-Applied Claims, Because They Are Not Justiciable. ...........................................................................55

CONCLUSION .......................................................................63

CERTIFICATION OF BAR MEMBERSHIP ...........................66

CERTIFICATE OF SERVICE................................................67

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*,
   26 F.4th 571 (3d Cir. 2022).......................................................... *passim*

*Berkley Ins. Co. v. Daniels*,
   No. 23-3031, 2024 WL 3379068 (D.N.J. Apr. 24, 2024) ...................... 54

*Borowski v. Kean Univ.*,
   68 F.4th 844 (3d Cir. 2023)................................................................ 27

*Brillhart v. Excess Ins. Co. of Am.*,
   316 U.S. 491 (1942) ................................................................. *passim*

*Burg v. Platkin*,
   No. 24-cv-10076, 2024 WL 5198776 (D.N.J. Dec. 23, 2024)................ 41

*Cedar Rapids Cellular Tel., L.P. v. Miller*,
   280 F.3d 874 (8th Cir. 2002)........................................................ 32, 40

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)........................................................................... 61

*Cornwell v. Cal. Bd. of Barbering & Cosmetology*,
   962 F. Supp. 1260 (S.D. Cal. 1997)................................................... 41

*Credit One Bank v. Hestrin*,
   60 F.4th 1220 (9th Cir. 2023) ........................................................... 36

*Doran v. Salem Inn*,
   422 U.S. 922 (1975)............................................................... 35, 40, 42

*DSSA v. Del. Dep't of Safety & Homeland Sec.*,
   108 F.4th 194 (3d Cir. 2024)........................................................ 36, 52

iii

*For Your Eyes Alone v. City of Columbus,*
   281 F.3d 1209 (11th Cir. 2002) ............................................ 37

*FTC v. Standard Oil Co. of Cal.,*
   449 U.S. 232 (1980) ........................................................ 51

*Getson v. New Jersey,*
   352 F. App'x 749 (3d Cir. 2009) ........................................ 46

*Hamilton v. Bromley,*
   862 F.3d 329 (3d Cir. 2017) .............................................. 24

*Haw. Housing Auth. v. Midkiff,*
   467 U.S. 229 (1984) ........................................................ 33

*Hicks v. Miranda,*
   422 U.S. 332 (1975) ............................................ 33, 39, 40, 42

*Hill v. Snyder,*
   878 F.3d 193 (6th Cir. 2017) ............................................ 37

*Huffman v. Pursue,*
   420 U.S. 592 (1975) ...................................................... 30, 31

*Jurado v. W. Gear Works,*
   619 A.2d 1312 (N.J. 1993) ................................................ 59

*Kelly v. Maxum Specialty Ins. Grp.,*
   868 F.3d 274 (3d Cir. 2017) .............................................. 55

*Lofstad v. Raimondo,*
   117 F.4th 493 (3d Cir. 2024) ............................................ 57

*Malhan v. Sec'y U.S. Dep't of State,*
   938 F.3d 453 (3d Cir. 2019) .......................................... 26, 33

*Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*,
  876 F.3d 481 (3d Cir. 2017) ................................................................ 54

*Mass. Delivery Ass'n v. Coakley*,
  671 F.3d 33 (1st Cir. 2012) ................................................................ 45

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
  457 U.S. 423 (1982).................................................................. *passim*

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024)........................................................................ 57

*N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.*,
  181 A.3d 257 (N.J. Super. Ct. App. Div. 2018).................................... 44

*Nationwide Biweekly Administration v. Owen*,
  873 F.3d 716 (9th Cir. 2017) .............................................................. 38

*New Jersey-Philadelphia Presbytery v. N.J. State Board of Higher Ed.*,
  654 F.2d 868 (3d Cir. 1981) .............................................................. 43

*NOPSI v. New Orleans*,
  491 U.S. 350 (1989)................................................................... 50, 53

*NSSF v. Atty. Gen. of N.J.*,
  80 F.4th 215 (2023) ................................................................... *passim*

*NSSF v. Brown*,
  No. 25-cv-1115, 2025 WL 2967355 (D. Md. Oct. 21, 2025) ............ 32, 42

*Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*,
  477 U.S. 619 (1986)........................................................................ 30

*Olde Disc. Corp. v. Tupman*,
  1 F.3d 202 (3d Cir. 1993) ................................................................ 53

*PDX v. Comm'r N.J. Dep't of Labor & Workforce Dev.*,
  978 F.3d 871 (3d Cir. 2020) ...................................................... *passim*

*Pennzoil Co. v. Texaco, Inc.*,
    481 U.S. 1 (1987)...................................................................44

*Perez v. Ledesma*,
    401 U.S. 82 (1971)................................................................46

*Reifer v. Westport Ins. Corp.*,
    751 F.3d 129 (3d Cir. 2014) .......................................53, 57

*SBA List v. Driehaus*,
    573 U.S. 149 (2014)........................................................59, 60

*SFFA v. Harvard Coll.*,
    600 U.S. 181 (2023)..............................................................41

*Smith & Wesson Brands, Inc. v. Attorney General of N.J.*
    27 F.4th 886 (3d Cir. 2022)...............................................28

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
    605 U.S. 280 (2025)..............................................................59

*Spargo v. N.Y. State Comm'n on Jud. Conduct*,
    351 F.3d 65 (2d Cir. 2003) ...........................40, 42, 43, 44

*Sprint Commc'ns, Inc. v. Jacobs*,
    571 U.S. 69 (2013)..........................................................27, 29

*Tafflin v. Levitt*,
    493 U.S. 455 (1990)..............................................................52

*Tony Alamo Christian Ministries v. Selig*,
    664 F.3d 1245 (8th Cir. 2012).......................................40, 42

*Trainor v. Hernandez*,
    431 U.S. 434 (1977)..............................................................29

*TransUnion v. Ramirez,*
594 U.S. 413 (2021) ................................................................ 57

*Tucker v. Ann Klein Forensic Ctr.,*
174 F. App'x 695 (3d Cir. 2006) ........................................... 37

*United States v. Harris,*
144 F.4th 154 (3d Cir. 2025) ................................................ 57

*United States v. Rahimi,*
602 U.S. 680 (2024) ................................................................ 57

*Wilton v. Seven Falls Co.,*
515 U.S. 277 (1995) .................................................... *passim*

*Younger v. Harris,*
401 U.S. 37 (1971) ....................................................... *passim*

**Statutes**

15 U.S.C. §7901(a)(3) ................................................................ 4

15 U.S.C. §7902 ............................................................................. 5

15 U.S.C. §7903(5)(A) ........................................................... 5, 62

18 U.S.C. §922 ............................................................................ 62

28 U.S.C. §1292(a)(1) ................................................................ 4

28 U.S.C. §1331 ............................................................................ 4

N.J. Stat. Ann. §2C:39-3 ......................................................... 12

N.J. Stat. Ann. §2C:39-5(a) ............................................... 15, 29

N.J. Stat. Ann. §2C:39-9(a) .......................................... *passim*

N.J. Stat. Ann. §2C:39-9(k) ...................................................... 12

N.J. Stat. Ann. §2C:44-2(b) ...................................................... 29

N.J. Stat. Ann. §2C:58-2(a)(3) ................................................. 13

N.J. Stat. Ann. §2C:58-34 ......................................................... 7

N.J. Stat. Ann. §2C:58-35 ................................................. *passim*

New Jersey Product Liability Act, N.J. Stat. Ann. § 2A:58C-2............. 15

Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§7901-7903 .... 4

**Rules**

FRCP 15(c)(1)(B) ...................................................... 39

N.J. Ct. R. 4:33-2 ...................................................... 44

**INTRODUCTION**

N.J. Stat. Ann. §2C:58-35 (Section 35) gives the New Jersey Attorney General (NJAG) an exclusive cause of action to seek civil remedies against firearms-industry members who violate some other law, engage in other unreasonable conduct, or fail to implement reasonable controls to prevent illegal sales, thefts, and the like. But this appeal is not about the merits of that law. Instead, it asks whether a set of as-applied challenges brought by the National Shooting Sports Foundation (NSSF) fits hornbook procedural and jurisdictional rules. It does not.

This is not NSSF's first time overlooking important threshold rules in challenging Section 35. Years ago, NSSF pursued a facial challenge to the statute, arguing it could not be validly applied at all. In trying to establish standing, NSSF alleged only that its members made and sold guns—nothing more. This Court ruled unanimously in August 2023 that its submission failed Article III. *NSSF v. Atty. Gen. of N.J.*, 80 F.4th 215 (2023) (*NSSF I*). NSSF did not amend its pleadings to offer more specific allegations of what arguably proscribed conduct its members wanted to engage in, and the case lay dormant—having been dismissed—for a year and a half. Even as the NJAG filed Section 35 actions, NSSF stood silent.

Everything changed after the NJAG filed a civil enforcement action against Glock, an NSSF member, in state court. Glock itself moved to dismiss on several bases, including preemption under the Protection of Lawful Commerce in Arms Act (PLCAA). And NSSF sought to reignite this federal suit too. NSSF, to be clear, no longer raised its facial preemption challenge; it instead pressed as-applied theories, including to its member Glock, based on the enforcement action. The district court and the NJAG agreed NSSF now satisfied Article III for this as-applied challenge—after all, current precedent holds that an association can rely on the Article III injuries of a member, if that member could sue in its own right. But as the district court recognized, the choice to bring an action based on Glock's injuries has consequences: NSSF cannot "rely on Glock for purposes of satisfying its Article III standing, but distance itself from Glock for the purposes of *Younger*." JA21 n.10. Consistent with how courts have treated such claims by associations, if Glock's suit would face abstention, so too NSSF's.

*Younger* abstention thus bars an as-applied challenge based on the application of Section 35 to Glock. *See Younger v. Harris*, 401 U.S. 37 (1971). Glock is facing the sort of state-court action to which this Court

has previously demanded abstention: the NJAG has filed a suit, as a sovereign, charging Glock with violating its laws, based on a preexisting investigation, and seeking both backward- and forward-looking remedies to right public wrongs. *Glock* had been filed months before NSSF brought this challenge, and the *Glock* docket offers ample opportunity for Glock and NSSF to press the same arguments (as Glock already has), with appellate review available "all the way up to the United States Supreme Court." JA23 n.13. And NSSF's efforts to find a rare *Younger* exception all prove wanting on both the facts and the law. NSSF cannot proceed with this collateral attack on the pending *Glock* suit.

The district court was right to stop there, because NSSF still lacks Article III standing to pursue its remaining theories. Beyond the application of Section 35 to Glock itself, NSSF raises challenges as to the law's applications to third-party sellers of Glocks; entities who make guns that NSSF thinks are like Glocks; and a pair of now-concluded suits against non-NSSF members who sold thousand-round cases of ammunition to cash purchasers with no controls to ensure the sales were lawful whatsoever. But NSSF shows no member similarly situated to Glock or to these two non-member defendants, nor does any NSSF member attest it would

engage in such conduct but for Section 35. So these theories again fail on Article III grounds, just as NSSF's original attacks did in 2023. This Court should affirm.

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331. This Court has appellate jurisdiction under 28 U.S.C. §1292(a)(1). As discussed below, NSSF has not established Article III standing for three of its four as-applied claims, as with its now-abandoned facial claim.

## COUNTERSTATEMENT OF THE ISSUE PRESENTED

Whether the district court properly abstained.

## RELATED CASES AND PROCEEDINGS

This case was previously before this Court as No. 23-1214. The state-court enforcement action against Glock is pending in New Jersey Superior Court, *Platkin v. Glock, Inc., et al.*, No. ESX-C-286-24; JA896.

## COUNTERSTATEMENT OF THE CASE

A.    PLCAA.

In 2005, Congress enacted PLCAA, 15 U.S.C. §§7901-7903, which gives covered industry members a defense to certain suits seeking relief "for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. §7901(a)(3); *see also id.* §7901(a)(6)-(7) (decrying

suits "imposing liability on an entire industry for harm that is solely caused by others," especially when they "would expand civil liability in a manner never contemplated … by the legislatures of the several States"). PLCAA therefore instructs that certain civil actions "against a [licensed] manufacturer or seller of a [firearm] product … resulting from the criminal or unlawful misuse of a qualified product by the person or a third party" "may not be brought." *Id.* §§7902, 7903(5)(A).

At the same time, Congress was not protecting sellers from accountability for their own misconduct. So in addition to categorically excepting suits that do *not* seek relief based on "the criminal or unlawful misuse" of a firearm at all, PLCAA enumerates six exceptions to its preemptive sweep even for actions that *do* seek such relief. And because PLCAA speaks to the kinds of "actions" that may not be brought, the six exceptions are structured in the same way: they address what kinds of "actions" may be filed, such as "an action brought against a seller for negligent entrustment or negligence per se" or an "action" for design defect. *Id.* §7903(5)(A)(ii), (v). One exception—the predicate exception—allows any "action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or

marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii).

B.    Section 35.

In July 2022, New Jersey enacted N.J. Stat. Ann. §§2C:58-33 to -35, granting the NJAG an exclusive cause of action to seek civil remedies against firearm-industry members if they engage in misconduct, whether by violating an independent statutory provision or by violating the duties imposed by Section 35 itself. *Id.* §2C:58-35(a)(1)-(3), (b). Section 35 has two core provisions, one of which has two distinct prongs. The first provision—Section 35(a)(1)—covers actors who engage in "conduct either unlawful in itself or unreasonable under all the circumstances." *Id.* §2C:58-35(a)(1). Section 35(a)(1) thus provides a cause of action against conduct that either (A) violates other statutes and regulations (independently-unlawful prong) or (B) is tortious and thus wrongful in another way (unreasonableness prong).

The second provision—Section 35(a)(2)—requires covered entities to "establish, implement, and enforce reasonable controls" regarding the "manufacture, sale, distribution, importing, and marketing of gun-related products." *Id.* §2C:58-35(a)(2). "Reasonable controls" means

"reasonable procedures, safeguards, and business practices that are designed to" (1) prevent gun-product sales to certain prohibited categories of persons, (2) prevent loss or theft, (3) ensure compliance with other federal and state laws, and (4) ensure compliance with state regulatory law. *Id.* §2C:58-34. So in addition to Section 35(a)(1)'s independently-unlawful prong, which establishes a cause of action for violating an independent law or regulation, Section 35(a)(2) establishes an affirmative duty for New Jersey gun sellers to implement and enforce these statutorily defined reasonable controls, and a separate cause of action if they do not.

In sum, then, Section 35 provides three distinct causes of action:

- Section 35(a)(1) independently-unlawful claims;
- Section 35(a)(1) unreasonableness claims; and
- Section 35(a)(2) claims against entities that violate its requirement to establish, implement, and enforce enumerated reasonable controls.

Of the six civil enforcement actions the NJAG has brought to date, all allege Section 35(a)(1) independently-unlawful claims or Section 35(a)(2) claims; none hinges on a Section 35(a)(1) unreasonableness claim. *See infra* at 12-17 (describing actions in more detail).

C.    *NSSF I*.

Over four months after Section 35's enactment, NSSF filed its initial complaint challenging the validity of Section 35. ECF 1. Then, in late November, it followed with a broad-scale preliminary-injunction motion, seeking facial invalidation of the law on a host of theories, ranging from its claim that the law was preempted by PLCAA for being insufficiently "concrete," to theories under the dormant Commerce Clause, vagueness doctrine, First Amendment, and Second Amendment. ECF 4. The parties swiftly briefed NSSF's preliminary-injunction motion over the holidays, and in January, without ever holding a hearing or argument, the district court granted NSSF's motion for a preliminary injunction, JA27, enjoining the NJAG from enforcing Section 35 in full, ECF 18.

The NJAG appealed, and this Court granted a partial stay pending appeal, allowing the NJAG to continue to enforce Section 35:

- (a) against anyone other than NSSF, its members, or their agents or licensees;

- (b) against anyone who is not a "manufacturer," "seller," or "trade association" as those terms are defined in 15 U.S.C. §7903;

- (c) in any cases "not predicated on harm 'resulting from the criminal or unlawful misuse of a qualified product by the person or a third party' within the meaning of 15 U.S.C. §7903(5)(A)"; or

- (d) "by bringing actions that fall within the exceptions set forth in 15 U.S.C. §7903(5)(A)(ii), (iii)(I), or (iii)(II)."

No. 23-1214, 3d Cir. Dkt. 16, at 1-2.

Throughout briefing and oral argument, the State defended Section 35 in full, explaining that while its provisions covered industry members' own misconduct, the law did not impose liability merely for selling guns—*i.e.*, that it was not, as NSSF contended, a statutory redux of the strict-liability-style theories PLCAA was designed to prohibit. The NJAG thus stressed that "NSSF ha[d] identified no current or intended conduct besides that its members sell guns, which obviously does not violate the statute, let alone establish a substantial enforcement threat." No. 23-1214, 3d Cir. Dkt. 58 at 5. But the NJAG never foreswore unreasonableness claims or reasonable-control claims where warranted and never pledged that the NJAG would bring only independently-unlawful claims, which is why NSSF can cite nothing for its assertion. *See*, *e.g.*, *id.* at 12-15 & n.3, 20, 24-25 (defending these portions of the statute specifically).

So too when this Court heard argument. Early on, counsel emphasized that while the statute did not prohibit merely engaging in lawful commerce with firearms, it did go after "culpable misconduct," which included "*either* violating the law, *or doing something that is a tort*, so []

9

culpable in a different way." JA377 (emphasis added). Counsel for NSSF then complained the NJAG had *not* made "any representation, which, you know, we would gladly take," JA413, that would preclude bringing actions under all of Section 35's provisions, and not simply its independently-unlawful prong, JA413-16. On rebuttal, the NJAG reiterated that Section 35 did not impose liability just for selling firearms, and emphasizing Section 35(a)(1)'s unreasonableness prong—distinct from its unlawful-in-itself prong—since "you could easily imagine facts that maybe they comport with the law … but they're also clearly unreasonable." JA444 (giving a hypothetical that "checks the boxes on the law, but it certainly seems unreasonable," and noting "if New Jersey wanted to take action to shut that kind of thing down, I don't see how PLCAA would have any problem with that").

In August 2023, this Court vacated the district court's preliminary injunction and directed that NSSF's action be dismissed for lack of jurisdiction without reaching the merits. *NSSF I*, 80 F.4th at 219-20. Writing for the unanimous panel, Judge Bibas explained that NSSF's description of its intended conduct was too "generalized," alleging only that "its members plan to make, market, and sell guns," without showing "how simply

making, marketing, or selling guns will inevitably trigger this Law." *Id.* at 220-21. This Court noted, meanwhile, that the NJAG was clear "the Law covers only industry members' 'own *misconduct*'"—as opposed to imposing liability "just for participating in 'lawful commerce.'" *Id.* at 221 (quoting Oral Arg. 5:23-35 (JA373, 377)). So while there could of course be fact-specific disputes about what was "misconduct," it remained "unclear what the Foundation and its members [feared] to do." *Id.* In other words, NSSF "never explain[ed] how simply making, marketing, or selling guns"—its sole alleged conduct—would "trigger this law." *Id.*

This Court added that while NSSF's failure to show "a substantial likelihood that the Law will be enforced against it … alone suffice[d] to defeat standing," "the Law's purely civil nature" "bolstered" that conclusion, since "civil penalties lower the temperature"—allowing a party to defend a future enforcement action without worrying that, if its defenses fail, it will face criminal sanction. *See id.* at 222 (observing "much of the point of pre-enforcement challenges is to let people vindicate their constitutional rights without having to risk prosecution"). And while pre-enforcement challenges are "unusual" and permissible only if a plaintiff can

"show that the stakes are high and close at hand," NSSF's suit fell "far short of even the 'normal' pre-enforcement challenge." *Id.* at 223.

D.   Section 35 State-Court Enforcement Actions.

Between this Court's August 2023 opinion and December 2024, the NJAG brought five enforcement actions. NSSF did not respond until February 2025 when, in the wake of the suit against Glock (the fifth suit), it sought to reopen the long-closed *NSSF I* docket.

First, in December 2023, the NJAG sued JSD Supply and Eagle Shows ("JSD/Eagle") for making targeted sales to New Jersey residents of products for making unserialized and untraceable ghost guns. JA476. The complaint alleged that these defendants had violated Section 35 and separate statutes, including New Jersey statutes prohibiting ghost guns, N.J. Stat. Ann. §§2C:39-3(n), -9(n), and the purchase of kits and frames to make them, *id.* §2C:39-9(k). *See* JA526-27. Since neither defendant is a federal firearms licensee (FFL), neither is covered by PLCAA, and they did not assert PLCAA when they moved to dismiss. JA549. Discovery is ongoing. NSSF has never claimed these defendants are NSSF members.[1]

---

[1] NSSF reports having over 10,000 members, Br.1, but its membership list is private, so the NJAG necessarily relies on NSSF's current and prior representations, *e.g.*, Br.12, for these purposes.

Second, also in December 2023, the NJAG sued FSS Armory, a New Jersey FFL that left stacks of unsecured firearms within arms-reach of a poorly secured ground-floor window for months and posted pictures of those unsecured firearms to its website. JA568-94. That conduct violated at least three separate New Jersey laws, including the requirement that "[n]o firearm … shall be placed in any window or in any other part of the premises where it can be readily seen from the outside." N.J. Stat. Ann. §2C:58-2(a)(3); *see* JA568. Thus, while third parties saw those pictures, broke into the store, stole guns, and used and trafficked them, the NJAG's suit was based on FSS Armory's own misconduct. *See* JA583-91. FSS invoked PLCAA and other constitutional theories in moving to dismiss, and the trial court rejected them based on the facts. *See* JA519-26, 596. FSS settled the case by agreeing to implement new compliance measures and pay a $125,000 penalty. ECF 73. NSSF has never claimed FSS is a member (and indeed does not even mention this case in its brief).

Third and fourth, in November 2024, the NJAG brought actions against Point Blank Guns and Ammo LLC ("Point Blank") and Butch's Gun World ("Butch's"), for selling 1,000-round cases of .223-caliber rifle ammunition to undercover investigators for cash, without taking steps to

ensure the buyer was not a person prohibited from possessing firearms, like a felon or domestic abuser. JA628-30, 647-49. Each of these suits likewise allege misconduct by the defendant itself: a failure to institute reasonable controls—and, indeed, to institute any controls at all—to prevent sales of gun-related products to prohibited-persons, as statutorily required by Section 35(a)(2). *See* JA641-42, 660-61. And, because the suits were founded upon controlled buys, neither sought relief "resulting from the criminal or unlawful misuse of a qualified product"—a prerequisite for PLCAA to apply. *See* 15 U.S.C. §7903(5)(A).

Understandably, then, neither Point Blank nor Butch's ever raised a PLCAA defense. Point Blank admitted liability and entered into a consent judgment agreeing to institute compliance measures going forward and pay $2,500 for attorney's fees and costs. JA682-90. Butch's lost at summary judgment, was assessed $8,000, and never appealed. *See Platkin v. Butch's Gun World*, No. CUM-C-37-24 (finding Butch's violated Section 35(a)(2)); JA927. NSSF has not claimed either as a member.

Fifth, in December 2024, the NJAG sued Glock, Inc. ("Glock"), and its Austrian parent, Glock Ges.m.b.H. JA692. This suit is again premised on knowing misconduct by Glock itself: that it knowingly created a

handgun that can fire 1,200 rounds-per-minute—as an illegal machinegun—with the effortless insertion of a cheap, dime-sized "switch." JA693. Glock allegedly knew of this functionality from the product's inception—which distinguishes Glock's design from every other handgun sold in the United States, *see* JA733. After Glock had ample warning that its handguns were in fact repeatedly used as machineguns, Glock exclusively sold non-switchable alternate designs in Europe—but not in the United States. JA734. Instead, Glock's Facebook page links to videos glorifying "switched" Glock machineguns on social media. JA700.

The complaint alleges that Glock violated separate statutes in addition to Section 35, including N.J. Stat. Ann. §2C:39-9(a) (causing manufacture of machineguns), *id.* §2C:39-5(a) (aiding and abetting possessing machinegun or device adaptable for use as such); and New Jersey's Product Liability Act (NJPLA). JA745-56. While the civil enforcement suit seeks injunctive relief, restitution, and costs, it seeks no damages resulting from bad acts by criminals, focusing only on Glock's alleged misconduct. NSSF *does* claim Glock—though not its Austrian parent—as an NSSF member. Indeed, Glock's General Counsel joined NSSF's Board of

Governors on January 16, 2025—a month after the state enforcement action was filed, and shortly before NSSF sought to reinitiate *NSSF I*.

The state trial court denied Glock's motion to dismiss, which raised the same PLCAA arguments NSSF presses here. *See* JA896-918 (state court decision); JA762-814 (Glock motion). The court found that the NJAG's complaint "plausibly alleges knowing violations of specific predicate statutes proximate to the harm suffered," given the alleged violations of multiple independent New Jersey firearms laws, including N.J. Stat. Ann. §2C:39-9(a)'s prohibitions on "causing or aiding and abetting the manufacture or possession of illegal machine guns." JA911, 913. The court also found that Glock's alleged conduct involved more than "general awareness of misuse": Glock "'deliberately designed' its handguns to be readily convertible to illegal machine guns, marketed those products, and failed to employ reasonable controls or modify the design despite numerous warnings and increasing harm." JA912-13; *see also* JA913-16 (rejecting Glock's constitutional theories, which echoed claims previously raised by NSSF in *NSSF I*). Glock sought leave for an interlocutory appeal, which the New Jersey intermediate appellate court rejected, observing that "the issues movants seek to raise will be more suitable for appellate

review after discovery and on a more complete record." *Platkin v. Glock*, AM-160-25T2 (N.J. Super. Ct. App. Div. Dec. 12, 2025).[2]

E.    Proceedings Below.

In early February 2025, in the wake of the *Glock* suit—and eighteen months after this Court's decision in *NSSF I*—NSSF moved to reopen the docket. JA92-105. The court granted that motion, stating without citation that the NJAG had "brought an enforcement action against one of NSSF's members" "despite claiming it would not do so." JA108. (NSSF itself has never claimed the NJAG made this promise, nor could it: the NJAG does not have a list of NSSF members.) NSSF filed an amended complaint and preliminary-injunction motion, asking the federal court to find Section 35

---

[2] In October 2025, about eight months after NSSF sought to reopen this suit, the NJAG filed a sixth civil enforcement action, against Sig Sauer, Inc., alleging that a design defect in its P320 handgun makes it unusually likely to discharge accidentally and injure users, including law-enforcement officers, thus violating separate statutes, including the NJPLA and NJ Consumer Fraud Act, as well as Section 35. Compl., *Platkin v. Sig Sauer, Inc.*, ESX-C-217-25, https://tinyurl.com/fcwmwwxv. These claims do not allege harms resulting from the "criminal or unlawful misuse" of firearms at all. The *Sig Sauer* suit includes the only Section 35 "marketing" claim brought to date, alleging Sig Sauer wrongfully misled consumers into believing its firearms were safe from unintended discharge and failed to warn about this danger.

facially invalid and enjoin "any" enforcement of Section 35 against NSSF and its members. ECF 60-22 at 2.

But NSSF then changed course and conceded it was not bringing the "facial attack" it previously brought, JA852; *see also* JA436 (agreeing "there are some lawsuits that aren't subject to preemption here"); JA852 (confirming its "preemption claim is not a facial attack"); JA854 (conceding no First Amendment problem with applying law to "market[ing] an unlawful product"). NSSF instead seeks relief as applied to essentially four fact patterns: to (1) its member Glock (the sole NSSF member facing suit) for the conduct over which it is being sued; (2) NSSF members that sell Glocks (on the theory they might be similarly situated to Glock by selling the same products); (3) NSSF members that make other striker-fire pistols (on the theory NSSF thinks such items are comparable to Glocks); and (4) NSSF members that NSSF thinks might face an action like those brought in *Point Blank* or *Butch's* (though who notably do not claim they wish to do what Butch's or Point Blank did). *See* JA195-97.

After holding a hearing on NSSF's motion, the district court in July 2025—now with the benefit of the *NSSF I* transcript to understand what the State previously stated, *see* JA370-474—ruled decisively against

NSSF, denying a preliminary injunction and staying the case on abstention grounds, JA23. Rather than suggesting anything improper about the NJAG's conduct, the district court instead raised questions about the "unclear" explanation for NSSF's litigation choices, "arguably disingenuous" arguments, and "underlying motivations." JA21-22 & nn. 10-12.

The district court first assessed Article III standing, agreeing NSSF has standing based on the suit against its member Glock, but not finding standing based on any other theory. *See* JA11-12 (finding standing because "Glock is a member of NSSF and would have standing," and "the alleged harm to Glock is readily traceable to Defendant [and] would be easily redressed by" NSSF's requested injunction). That much was undisputed—the NJAG had conceded that NSSF had standing as to Glock itself, and disputed it only as to NSSF's *other* three standing theories (namely, entities that sell Glocks, entities that make guns that NSSF thinks are like Glocks, and entities that NSSF thinks could face actions like the *Point Blank* and *Butch's* actions). *See* JA337-42.

But although Article III was satisfied as to NSSF's collateral attack on the pending *Glock* suit, the court found abstention proper under *Younger*. First, it recognized that *Glock* is a "quasi-criminal civil

enforcement action" to which abstention applies. JA16-17. The NJAG filed *Glock* "in its sovereign capacity," "to sanction Glock for an alleged wrong," including violations of "a criminal statute"—N.J. Stat. Ann. §2C:39-9(a), governing machineguns. JA17. It arose from an investigation "using resources similar to those used in a criminal enforcement action." JA17. And nothing in *NSSF I* supported a contrary result. JA16-17.

Next, the court found the *Middlesex* factors satisfied. *See* JA17-18; *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). *Glock* was "ongoing" when NSSF reopened this case, and the timing of NSSF's initial complaint is irrelevant, as that complaint "is effectively a nullity" after *NSSF I*. JA17-18. The pending *Glock* action implicates "important state interests" in protecting New Jerseyans' safety. JA18. And the *Glock* suit offers "an adequate opportunity to present constitutional arguments"—especially as Glock *already* raised "nearly identical" constitutional challenges "to those presented by NSSF in this case." JA18. Further, although "NSSF is not a party to" the *Glock* suit, "NSSF's and Glock's interests are intertwined" since "all of the challenges raised by NSSF here are also asserted by Glock in its defense," and finding it

"inconsistent, and arguably disingenuous, for NSSF to rely on Glock for purposes of satisfying its Article III standing, but distance itself from Glock for the purposes of *Younger*." JA19-22 & n.10.

Last, while NSSF's failure to prove a likelihood of success on the merits sufficed alone to deny relief, the court also found "that there is no irreparable harm because NSSF can seek to intervene in the Glock Suit and appeal any adverse decision through the New Jersey appellate system all the way up to the United States Supreme Court." JA23 n.13. "Insofar as the first two gateway factors for granting preliminary relief have not been met," the court "need not consider the remaining two." *Id.*

NSSF appealed, challenging only the district court's *Younger* ruling. *E.g.*, Br.4 (statement of the issue).

## SUMMARY OF ARGUMENT

This district court correctly abstained as to the sole application of Section 35 for which it had Article III jurisdiction.

**I.** The district court correctly abstained as to NSSF's challenge as-applied to member Glock's conduct, its sole member facing suit.

**A.** *Younger* applies. *Younger* protects both comity and federalism by avoiding duplicative actions or clashing judgments for particular

categories of state-court actions that bear on the sovereign's interests—including civil actions "akin to a criminal prosecution" in the relevant respects. *Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*, 26 F.4th 571, 576 (3d Cir. 2022). *Glock* fits the bill: it was commenced by the NJAG on behalf of the sovereign, charges the substantive violation of its laws, seeks public remedies for those violations, and arose from an investigative process. That Section 35 itself is civil is not to the contrary—*Younger* tests whether the civil proceedings are structurally similar to a criminal one, not whether an actual criminal conviction is on the line.

All three *Middlesex* factors also support abstention, where *Glock* is (1) an ongoing judicial suit, (2) where the State has important interests, and (3) which presents an adequate opportunity to raise NSSF's own arguments. As to the first, *Glock* was already pending when NSSF brought its as-applied claims. That does not change simply because NSSF chose, as its mechanism, a motion to reopen a docket that lay dormant for eighteen months from a prior facial challenge—any more than had NSSF filed in a new docket. NSSF did not even have standing to press that previous case, and it never proceeded substantially to the merits. As to the third, *Glock* offers an ample way to press PLCAA claims as defenses: Glock

already is, and NSSF could intervene to do the same. Nor is the fact NSSF and Glock are distinct parties to the contrary: NSSF's standing is derivative of Glock's, so it stands in Glock's shoes for *Younger*.

NSSF's last-ditch efforts to avoid this result fail. Its claims of "bad faith" fail: it cannot show *Glock* was brought without legal basis, the only question this narrow *Younger* exception asks. And its claims of NJAG gamesmanship ring hollow: NSSF cites nothing for the promises it claims the NJAG reneged on, and the transcripts instead make clear the NJAG never foreswore actions like these. Nor, for related reasons, can NSSF claim that Section 35 somehow triggers *Younger's* exception for "flagrantly violative" statutes, 401 U.S. at 53, and its attempt to yoke this suit to the First Amendment falls flat, because not one of the NJAG's six Section 35 suits implicates the kind of free-speech issues that NSSF speculates could arise in some hypothetical future action.

**B.** Had the district court not correctly abstained under *Younger*, it just as easily could have abstained under the *Brillhart-Wilton* doctrine. *See Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282-88 (1995). Parallel state proceedings

like these weigh heavily against accepting jurisdiction, given the need to avoid duplication, and this Court's factors all point the same way.

**II.** NSSF cannot satisfy Article III for its three other proposed as-applied theories. First, as to entities that merely sell Glocks, NSSF never established that they engaged in the knowing (let alone extreme) behavior alleged against Glock, and thus shows no substantial threat of enforcement to justify this hypothetical pre-enforcement suit. Second, as to entities that sell pistols NSSF says are similar to Glocks, it never pleads these entities actually engaged in similarly knowing conduct to Glock, let alone that they wish to do so—and the NJAG itself distinguished their products from Glocks in *Glock* itself. Third, as to the *Point Blank*/*Butch*'s fact pattern, NSSF identifies no member who wishes to sell large quantities of ammunition for cash with no controls whatsoever.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to abstain under *Younger*. *Hamilton v. Bromley*, 862 F.3d 329, 333 (3d Cir. 2017).

## ARGUMENT

Now that NSSF has abandoned its demand for facial relief, all that is left are its attacks on four applications: to (1) member Glock (the sole

NSSF member facing suit) for the conduct over which it is being sued; (2) members that sell Glocks; (3) members that make striker-fire firearms purportedly comparable to Glocks' switchable products; and (4) members NSSF thinks might face suits like *Point Blank* or *Butch's*. The first application is barred by *Younger* abstention, as the district court held, and in the alternative *Brillhart-Wilton* abstention. For its remaining three as-applied theories, NSSF has not satisfied Article III.

## I. The District Court Rightly Abstained As To The *Glock* Suit.

The bulk of NSSF's lawsuit is its collateral attack on the *Glock* suit, which explains why NSSF sought to reopen its dormant litigation only in the wake of *Glock*, and why three of its as-applied theories turn on *Glock*: to Glock itself, retailers who sell Glocks, and manufacturers who allegedly make similar pistols. *See* JA165-66 (NSSF emphasizing *Glock* as the principal NJAG enforcement action of concern). Because abstention is designed for precisely these kinds of collateral attacks on state enforcement actions, this Court should affirm.

### A. *Younger* Bars NSSF's Collateral Attack On The *Glock* Suit.

To "avoid a duplication of legal proceedings," *Younger*, 401 U.S. at 44, to "promote comity" and "proper respect for state functions," and "to

restrain equity jurisdiction from operating when state courts provide adequate legal remedies," *PDX v. Comm'r N.J. Dep't of Labor & Workforce Dev.*, 978 F.3d 871, 882 (3d Cir. 2020), *Younger* "requires federal courts to abstain from deciding cases that would interfere with certain ongoing state proceedings," *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 461 (3d Cir. 2019). To implicate *Younger*, the state proceeding must fall into one of three categories: (1) "state criminal prosecutions"; (2) "civil enforcement proceedings" that are "akin to a criminal prosecution in important respects"; and/or (3) "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Altice*, 26 F.4th at 576 (cleaned up). If it does, the federal court next considers the "*Middlesex* factors," *i.e.*, whether: (1) "there are ongoing judicial proceedings"; (2) those proceedings "implicate important state interests"; and (3) "the party against whom abstention is asserted has an adequate opportunity in the state proceeding to raise constitutional challenges." *Id.* at 578. The *Glock* case is a covered civil enforcement action under *Younger*, and the *Middlesex* factors overwhelmingly favor abstention.

1. The *Glock* Suit Is A Covered Civil Enforcement Action Akin To A Criminal Action In The Relevant Respects.

A civil action fits *Younger*'s second category if it is "akin to a criminal prosecution in important respects." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79 (2013) (cleaned up). This does not require the civil action to be *substantively* criminal: courts do not assess "whether the current action is criminal or whether criminal charges are warranted," because a rule like that "would erase the quasi-criminal category of abstention" altogether. *PDX*, 978 F.3d at 884. Instead, the question is whether the civil suit is *structurally* alike criminal enforcement actions and thus implicates similar federalism concerns: courts ask if a suit "was initiated by a state in its sovereign capacity"; "sought to sanction the federal plaintiff as retribution for a violation of a legal right or duty"; and bears other similarities to a criminal case, "such as by beginning with a preliminary investigation that culminates with the filing of formal charges or by the state's ability to sanction the federal plaintiff's conduct through a criminal prosecution." *Borowski v. Kean Univ.*, 68 F.4th 844, 851 (3d Cir. 2023); *see also PDX*, 978 F.3d at 883 (same). The insight behind this category is simple: interference with a State's pending civil enforcement

action in its courts, to sanction an entity for violating its laws, offends sovereignty and comity just as interfering with a state prosecution does.

This Court's cases make the distinction plain. In *Altice*, this Court held that *Younger* abstention properly applied to a civil suit brought by New Jersey's Board of Public Utilities seeking to have a cable-television provider properly prorate its cable bills going forward, and to obtain penalties for its failure to do so in the past. 26 F.4th at 577-78. In *Smith & Wesson Brands, Inc. v. Attorney General of N.J.*, by contrast, this Court found no need to abstain in light of a state-court subpoena enforcement action, because the subpoena recipient had not violated "any substantive legal duty" by failing to comply. 27 F.4th 886, 892 (3d Cir. 2022). Neither suit was any more or less substantively criminal; the cable-television provider was not in any kind of criminal jeopardy for failing to prorate bills, any more than the subpoena recipient. Instead, the distinction was structural: *Altice* involved a civil enforcement suit brought by a sovereign for violations of substantive state law, seeking to sanction that misconduct, whereas *Smith & Wesson* did not involve any such action.

This case is plainly on the abstention side of the line. To start, the NJAG sued Glock (and its Austrian parent) on behalf of the State,

operating "in its sovereign capacity" to vindicate the interests of New Jerseyans generally. JA17; *see* N.J. Stat. Ann. §2C:58-35(b); *Alice*, 26 F.4th at 576-77. It arose from a detailed state investigation "culminating in the filing of a formal complaint," *Sprint*, 571 U.S. at 80; JA721-26, 742-45 (drawing on voluminous records compiled by the NJAG), and was initiated to address Glock's wrongful conduct: it alleges Glock's conduct violated several statutes housed within Title 2C (New Jersey's Code of Criminal Justice), including prohibitions on causing a machinegun to be manufactured, N.J. Stat. Ann. §2C:39-9(a), and aiding and abetting machinegun possession, *id.* §2C:39-5(a). JA17; *see* JA747-53 (relevant counts in *Glock*). The State in *Glock* also seeks sanctions for that misconduct, including restitution, JA757, itself a criminal remedy, *e.g.*, N.J. Stat. Ann. §2C:44-2(b), and injunctive relief, akin to the cease-and-desist order that this Court in *Alice* found to "qualify as sanctions" for *Younger* purposes. *See* 26 F.4th at 577; *see also*, *e.g.*, *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977) (recovery of welfare benefits); *PDX*, 978 F.3d at 884 (back taxes). In every respect, this state action—brought by a sovereign, after investigating and concluding that Glock violated its laws, to sanction its violations via penalties and forward-looking relief—fits *Younger*.

Although NSSF responds that this action lacks a requisite "criminal analog," that is wrong as a matter of law and fact alike. As an initial matter, state proceedings can be quasi-criminal even if "no criminal analog existed," because the question is whether the civil action operates like a criminal action and implicates federalism interests. *Altice*, 26 F.4th at 578 (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 627-28 (1986) (civil-rights enforcement action); *Middlesex*, 457 U.S. at 428-29 (attorney discipline hearing)); *see also PDX*, 978 F.3d at 883-84 (rejecting argument that *Younger* is inapplicable "because the only remedies available are civil in nature"). But in any event, there *is* "a criminal analog": the suit accuses Glock of engaging in misconduct that was in fact covered by criminal machinegun laws, *see* N.J. Stat. Ann. §2C:39-9(a), even if there is no criminal exposure or no actual prosecution is warranted here. *See PDX*, 978 F.3d at 884; *Huffman v. Pursue*, 420 U.S. 592, 604 (1975) (nuisance action "in aid of and closely related to criminal statutes" regarding obscenity laws warranted abstention).

In emphasizing that *NSSF I* described Section 35 as "purely civil" in nature, Br.35 (quoting 80 F.4th at 222), NSSF conflates two distinct points. *NSSF I* was considering Article III standing, and in assessing the

justiciability of a pre-enforcement challenge, precedent instructs reviewing courts to consider whether the statute is *substantively* civil or criminal. 80 F.4th at 222. For good reason: in the standing context, the existence of criminal penalties increases "the temperature"—the stakes—of requiring a party to risk criminal prosecution if it is denied pre-enforcement relief, and thus criminal statues weigh in favor of federal-court intervention. *Id.* But *Younger* is not concerned with the stakes of civil versus criminal exposure; instead, it protects federalism and state-sovereignty interests. *Huffman*, 410 U.S. at 603-07; *PDX*, 978 F.3d at 882. Those distinct interests require courts to ask whether a civil action is *structurally* like a criminal case in the sense that parallel federal proceedings would undermine sovereignty and federalism, since it interferes with a State acting in its sovereign capacity in its courts to vindicate public rights and sanction public wrongs—which is why, in the *Younger* context, a pending criminal proceeding weighs *against* federal-court intervention, not in favor. *See Altice*, 26 F.4th at 576. *NSSF I*, of course, never addressed that distinct question.

Finally, NSSF's claim that it did not formally ask the district court "to enjoin or otherwise interfere with" the *Glock* action, Br.21-22, is a red

herring. What matters is the relief NSSF sought, which avowedly would. *See* ECF 60-22 at 1-2 (seeking to enjoin "any" enforcement of Section 35 based upon this fact pattern); *see also NSSF v. Brown*, No. 25-cv-1115, 2025 WL 2967355, at *8 (D. Md. Oct. 21, 2025) (holding *Younger* barred NSSF's as-applied collateral attack on suit against Glock and making similar observation); *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 881-82 (8th Cir. 2002) (abstaining where federal-court injunction would enable related parties to "obstruct the Attorney General's attempts to enforce any remedy granted by the state courts"). Indeed, NSSF even admits (as it must) that Glock would benefit from "collateral effects" of the federal-court injunction that it seeks, Br.22; *see also* JA822 (similar). So the district court was right to treat NSSF's attempts to reignite this federal case only after the NJAG sued its member Glock in state court as implicating that same ongoing enforcement proceeding. *See* JA21-22.

2. The *Middlesex* Factors Likewise Support Abstention.

All three *Middlesex* factors—(1) "ongoing judicial proceedings" (2) "implicat[ing] important state interests" that give (3) the opposing party "an adequate opportunity … to raise constitutional challenges"—support abstention. *See Altice*, 26 F.4th at 578. NSSF concedes the second factor,

Br.39, only disputing the first and third. The district court correctly identified both as supporting abstention.

1. As to the first factor, the *Glock* suit was undeniably "judicial in nature and ongoing when" NSSF sought to reopen this closed case, *Alice*, 26 F.4th at 578-79, so the sole question is whether its initial, unsuccessful facial attack predating *Glock* changes the result. It does not.

*Younger* applies with "full force" if the state proceeding began "after the federal complaint is filed but before any proceedings of substance on the merits have taken place in federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). This proceedings-of-substance rule typically plays an important role where a pending federal suit is quickly *followed by* a state-enforcement action; there, the question is whether a federal lawsuit has sufficiently proceeded such that the state proceeding cannot overtake and displace it. *See*, *e.g.*, *Haw. Housing Auth. v. Midkiff*, 467 U.S. 229, 238 (1984) (federal litigants obtained preliminary injunction months before state entity began condemnation proceedings); *Malhan*, 938 F.3d at 464-65 (abstention improper where state-court action not pending at all, but simply "threatened"). That makes sense: *Younger* seeks to avoid

"duplication of legal proceedings," 401 U.S. at 44, but where a first-filed federal case is already well-advanced, duplication would cut the other way.

This case is entirely different, and implicates no such first-filed concerns, because there was no live first-filed federal case whatsoever. When the NJAG filed its action against Glock, NSSF had no pending suit. This Court had rejected NSSF's (then-facial) claims for lack of jurisdiction, and NSSF declined to amend its pleadings, so the docket lay dormant—the original complaint dismissed with prejudice on Article III grounds—for the past sixteen months. So there was nothing to displace, and there is no need to protect active federal litigation from being cut-off midstream by a subsequent state suit. Nor was that prior, dormant case truly first-filed when compared to the distinct theories and facts in this as-applied action: NSSF's suit was a blanket facial challenge to Section 35 that alleged only that NSSF members made and sold firearms, *NSSF I*, 80 F.4th at 220, whereas the *Glock* suit and now this collateral one turn on detailed facts about what, precisely, Glock did and knew.

Indeed, NSSF's choice to leave the *NSSF I* docket closed for eighteen months after its facial attack was dismissed, and to return to federal

court only in the wake of *Glock*, makes clear this is a second-filed, collateral attack on *Glock*. And it makes no difference that NSSF happens to have chosen as its litigation mechanism a motion to reopen the dormant *NSSF I* docket to assert its new as-applied claims rather than to file a new complaint raising the same challenges. Were the rule otherwise, opportunities for gamesmanship would be palpable: parties could simply rush into court with an underbaked pre-enforcement challenge, seek a hasty preliminary injunction, lose on jurisdictional grounds, and yet now have a foothold for collateral federal litigation. Or they could shoehorn new claims into an old, tangentially related federal case when state proceedings commence, claiming the "first-filed" mantle even where the tether is shaky. Neither is a basis for evading abstention.

In any event, even assuming this dismissed NSSF complaint qualifies as "first filed," it did not involve sufficient "proceedings of substance" to foreclose abstention. Even where pending federal proceedings precede a state-court action, after all, denying a TRO is not a "proceeding of substance" for abstention. *See Doran v. Salem Inn*, 422 U.S. 922, 924-25, 929 (1975). Nor is a denial of preliminary relief "on a non-merits ground," like ripeness or standing. *Credit One Bank v. Hestrin*, 60 F.4th 1220, 1226

(9th Cir. 2023). That describes this case: this Court declined to assess the merits of NSSF's prior facial theories and preliminary-injunction motion, where Article III foreclosed NSSF's facial claims at the threshold. *See* 80 F.4th at 218 ("Before reaching the merits, we must first ensure that this case presents a dispute suitable for courts to resolve.").

That the district court had erroneously entered a facial preliminary injunction, despite lacking jurisdiction to do so, does not change this analysis. Far from a full consideration of the merits, preliminary proceedings often reflect only "hasty first impressions" based on an "initial sketch" of a claim. *DSSA v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 206 (3d Cir. 2024). That was especially true here: the parties engaged in rushed briefing over NSSF's preliminary-injunction motion without discovery, a hearing, or even oral argument, and the district court's swift opinion preliminarily endorsing NSSF's facial theory—still the sole opinion siding with NSSF in a challenge to a Section 35 cognate—was unanimously reversed for lack of jurisdiction. Even NSSF has admitted those submissions were "a little bit fuzzier" than its theories now, JA852: indeed, that truncated briefing did not include *any* allegations regarding members' actions other than they "plan to make, market, and sell guns."

*NSSF I*, 80 F.4th at 220. It thus makes sense that Judge Quraishi concluded his own brief foray in evaluating a facial lawsuit that violated Article III—without a hearing, fact development, or argument—did not bar him from abstaining now.

NSSF's cited cases, Br.40-42, are distinguishable. One simply held that a plaintiff's decision to file a second amended complaint "seven years into [] litigation" in which a district court already granted summary judgment and a final injunction did not require a new *Younger* analysis. *Hill v. Snyder*, 878 F.3d 193, 200, 205-07 (6th Cir. 2017). In another, before the federal plaintiff had himself commenced a state-court action, "his federal action had been pending for more than one year, both the District Court and this Court had addressed and resolved the merits of several of [his] claims, and there had been one appeal to this Court"—so his later state-court action did not prevent *him* from continuing with his first-filed suit. *Tucker v. Ann Klein Forensic Ctr.*, 174 F. App'x 695, 698 (3d Cir. 2006). A third involved not merely "a thorough evidentiary hearing" on a TRO motion (unlike this case) but also an answer and motion for summary judgment—merits steps that never occurred here. *For Your Eyes Alone v. City of Columbus*, 281 F.3d 1209, 1213, 1218-19 (11th Cir. 2002).

*Nationwide Biweekly Administration v. Owen*, 873 F.3d 716 (9th Cir. 2017), does not help NSSF either. There, the Ninth Circuit simply found abstention unwarranted after a "fact-specific inquiry" into "the time that the district court has spent considering the case," noting two lengthy orders considering different claims, in-depth consideration of "the allegations and evidence," and the court's "detailed engagement with the merits." *Id.* at 728-30. This case featured no comparably "detailed engagement" prior to dismissal of the federal suit, *compare id.*—let alone as to the *Glock* fact pattern NSSF now attacks. Indeed, the very district judge who adjudicated NSSF's original preliminary-injunction motion without jurisdiction is the one who recognized this factor favored absten-tion and that the original complaint was "effectively a nullity," because NSSF's as-applied case was "not yet fully formed." JA18 (quoting *NSSF I*, 80 F.4th at 223). It is hard to believe he misunderstood his own prior adjudication.

By a similar token, the relation-back principle is inapposite. *Contra* NSSF Br.42-43. *Younger* does not rest solely on the filing date of the fed-eral complaint, but on whether sufficient merits proceedings occurred in federal court to justify risking federal interference with a sovereign's

action in its courts. *See Hicks*, 422 U.S. at 349-50; *supra* at 33-34. As explained above, not enough occurred here, and everything that did occur occurred without jurisdiction. *See supra* at 34-37. And regardless, the relation back rule cannot help NSSF, because the sweeping facial complaint NSSF filed in 2022 and its as-applied collateral attack against *Glock* hardly arise out of a single "conduct, transaction, or occurrence," FRCP 15(c)(1)(B)—one targets an entire law enacted in July 2022, the other a suit from December 2024. *See supra* at 8, 15-18. Were it otherwise, a party's failed facial challenge to a statute would always preclude abstention for later as-applied challenges—especially if a claimant is a membership organization. That NSSF insisted on forcing its as-applied theories into the moribund docket where it had pursed a facial challenge without standing does not allow it to now defeat *Younger*, any more than had NSSF filed its *Glock*-specific as-applied suit in a new DNJ docket.

2. As to the third *Middlesex* factor, the state-court litigation offers "an adequate opportunity ... to raise constitutional challenges." *Altice*, 26 F.4th at 578. Indeed, Glock itself raised the same claims in its state-court motion to dismiss, and the state court willingly adjudicated the merits in denying the motion. JA913-16. NSSF argues that *Younger* is inapplicable

because NSSF is not a party to that suit, Br.23, but errs twice over: first, NSSF cannot rely on Glock's injury for standing but evade Glock's pending action for abstention, and second, NSSF could intervene there.

First, as courts have repeatedly found, an association cannot bring a federal claim based specifically on harms to one of its members without facing the abstention consequences of state-court actions pending against that member. Broadly, even where the federal and state actions formally involve "legally distinct parties," abstention can still apply if the two are sufficiently "related that they should all be subject to the [same] *Younger* considerations." *Doran*, 422 U.S. at 928; *Hicks*, 422 U.S. at 349 (similar). The question is whether a federal plaintiff's "interests are so inextricably intertwined" with the state-court party that "direct interference with the state court proceeding is inevitable." *Spargo v. N.Y. State Comm'n on Jud. Conduct*, 351 F.3d 65, 82 (2d Cir. 2003) (cleaned up).

A paradigmatic example is where a membership organization in federal court "alleges standing based on injuries that are either directly or indirectly derivative of" individual members facing state-court proceedings. *Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1253 (8th Cir. 2012); *see also Cedar Rapids*, 280 F.3d at 881-82 ("close

connection" where two companies would allow them, if successful, "to obstruct" a state-court action against parent company); *Cornwell v. Cal. Bd. of Barbering & Cosmetology*, 962 F. Supp. 1260, 1270-71 (S.D. Cal. 1997) (*Younger* barred trade association's suit challenging state law where standing derived from enforcement against two members and it sought relief "on behalf of all [its] members"); *Burg v. Platkin*, No. 24-cv-10076, 2024 WL 5198776, at *6 n.5 (D.N.J. Dec. 23, 2024) (abstaining where association plaintiff challenged firearms law based on state-court enforcement proceedings against member). Were it otherwise, any state-court defendant could evade *Younger* simply by joining an association and then asking it to sue—relying on the very same Article III injuries, but avoiding abstention. *Younger* is more than some Maginot Line.

That fits this case perfectly. As the district court found, NSSF's and Glock's interests are the same here: NSSF has standing only for an as-applied claim tied to the *Glock* fact pattern because it is specifically asserting harms to member Glock. *See* JA11; *SFFA v. Harvard Coll.*, 600 U.S. 181, 199 (2023) (explaining an association can "assert standing solely as the representative of its members" if that member would have standing) (cleaned up)). NSSF thus cannot "rely on Glock for purposes of

satisfying its Article III standing, but distance itself from Glock for the purposes of *Younger*." JA21 n.10. In other words, because NSSF stands in the shoes of Glock for Article III purposes of this as-applied claim, the abstention doctrines that block Glock from bringing this claim itself apply equally to this collateral attack. *See Tony Alamo*, 664 F.3d at 1253; *Brown*, 2025 WL 2967355, at *8 (agreeing *Younger* barred NSSF's as-applied collateral attack on suit against Glock). In barring actions from associations whose standing theories are "intertwined" with a state-court defendant and would "direct[ly] interfere[] with the state court proceeding" against that member, *Spargo*, 351 F.3d at 82, established law bars maneuvers just like this.

*Doran* and *Hicks* are in accord. *Contra* Br.27-31. *Doran* held that *Younger* did not bar an action by two companies that had similar interests to a third that was a defendant in a state proceeding because they did not have common "ownership, control and management," 422 U.S. at 928-29; *Doran* did not involve an association whose standing depended on injuries to its member on whose behalf it was suing. *See Tony Alamo*, 664 F.3d at 1252-53 (noting the distinction). And *Hicks confirms* abstention is warranted. There, a theater's employees were defendants in a

state action for showing obscene films. 422 U.S. at 348. In a federal suit brought by the theater, the Court recognized *Younger* applied since the theater's and employees' "interests were intertwined" and its suit "sought to interfere with the pending state prosecution." *Id.* at 348-49. NSSF's and Glock's interests are at least as intertwined, given that NSSF is reliant on Glock's injuries for its own standing to bring this claim. And neither case limited derivative abstention to state-court defendants that *control* the federal plaintiff. *Compare* Br.28, *with Spargo*, 351 F.3d at 83 (rejecting identical claim that *Younger* is "limit[ed] … to cases where the parties are financially related or linked by mutual management").

*New Jersey-Philadelphia Presbytery v. N.J. State Board of Higher Ed.*, 654 F.2d 868 (3d Cir. 1981) (*NJPP*), is not to the contrary. There, this Court considered whether state enforcement proceedings against directors and officers of Shelton College concerning state licensing requirements warranted abstention in a federal suit brought by the College, its sponsors, students and parents, and a teacher. *Id.* at 877-84. Since the individual plaintiffs sued to vindicate First Amendment rights "distinct from the college's right to exist as a religious-educational institution," abstention was inappropriate. *Id.* at 878. Indeed, those individuals did

not (and could not) rely on Shelton College's harms for their own Article III standing theories—unlike NSSF here. So *NJPP* is inapposite, because far from asserting "distinct" constitutional claims, NSSF's collateral attack on *Glock* is derivative of (even representative of) Glock's claims—so its "success on the merits" is "derivative of whatever rights" Glock may itself have. *See Spargo*, 351 F.3d at 83-84.

Second, NSSF could intervene in *Glock*, providing it an opportunity to press the same arguments to redress the same injuries. NSSF bears "the burden" as "the federal plaintiff" to establish "'that state procedural law barred presentation of [its] claims.'" *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987). But NSSF cannot show its request for permissive intervention would be barred, *see* Br.44 (instead deeming it irrelevant that it may intervene, on its misguided theory that *Younger* should only apply to the party and those it controls, not associations relying on that party's injuries for representational standing), and intervention could occur here. Indeed, New Jersey courts take a liberal approach to intervention, *see* N.J. Ct. R. 4:33-2; *N.J. Dep't of Env't Prot. v. Exxon Mobil Corp.*, 181 A.3d 257, 265 (N.J. Super. Ct. App. Div. 2018), and the NJAG would not

even oppose NSSF's intervention, where the State is already joining issue on the same merits disputes.

Of course, this does not mean NSSF is forever barred from bringing a pre-enforcement challenge to a statute that has been enforced against any of its members. NSSF can bring as-applied claims based on any facts, subject to Article III, that is not predicated on some pending enforcement action against that member. *See Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 44-45 (1st Cir. 2012) (association asserted justiciable claims on behalf of numerous members who were *not* defendants in state proceeding).[3] That is why NSSF's other as-applied theories face no *Younger* bar— though they do fail on Article III grounds. *See infra* Part II. But as the district court found, if NSSF wants the benefits of the enforcement action against Glock for its Article III representational standing, NSSF must accept the abstention consequences. *See* JA21 & n.10. So NSSF is trapped in no "Scylla and Charybdis," Br.26; it simply must take the bitter with the sweet here.

---

[3] NSSF's resort to that case fails for a second reason: there was no risk of direct interference with the state proceedings there, because the federal suit sought an injunction against the Attorney General, while the state-court actions were brought by private parties. *See id.* at 44, 47.

3. None Of *Younger's* Narrow Exceptions Applies.

NSSF's claims that abstention is inappropriate anyway—averring the State engaged in gamesmanship, that its state-court action is flagrantly unlawful, and that its action imposes irreparable harm—also fail.

1. To start, NSSF's gamesmanship theory is deeply misguided. The association argues that the *Glock* suit was brought in "bad faith" and thus cannot be a state-court enforcement action that justifies abstention. *See* Br.46-47. But the state-court actions that trigger the extreme "bad faith" carveout are only those "brought 'without hope' of success," *Getson v. New Jersey*, 352 F. App'x 749, 753 (3d Cir. 2009) (quoting *Perez v. Ledesma*, 401 U.S. 82, 85 (1971)). NSSF does not claim *Glock* is such a lawsuit, nor could it: *Glock* already survived a state-court motion to dismiss, JA896, in a careful opinion that explained why Glock's alleged knowing conduct violates Section 35 and falls outside PLCAA's domain, JA911-13.

NSSF replies that *Glock* is a bad-faith suit because it is inconsistent with representations NJAG attorneys made to the district court and this Court, but even leaving aside that this has no bearing on what *Younger*'s actual bad-faith exception evaluates, NSSF is flatly wrong. NSSF claims the NJAG engaged in a bait-and-switch, promising to bring only Section

35(a)(1) independently-unlawful claims, but then bringing other kinds of Section 35 claims. Br.46-47. But there is a reason it does not cite pages of briefs or transcripts for its claims: the NJAG made no such promises. In *NSSF I*, all NSSF alleged was that "its members plan to make, market, and sell guns," 80 F.4th at 220, and so the NJAG was making a different representation: it "disavowed prosecuting [NSSF] or its members just for participating in 'lawful commerce,' which is all [NSSF] has said it wants to do." 80 F.4th at 221 (quoting recording reproduced at JA377). And the NJAG agreed that Section 35 was not the kind of statute that PLCAA bars: one "where the idea is you sell guns, something bad happened, therefore you should pay." JA393.

The NJAG has followed this promise: it has not filed the kind of strict-liability-style suits that predated PLCAA and would suggest liability for "every manufacturer" or seller "in the country"—the worries NSSF emphasized in *NSSF I. See* JA404-05, 413-16. Each of the NJAG's enforcement suits alleges the relevant defendant engaged in its "own *misconduct*," *accord NSSF I*, 80 F.4th at 221, and most cannot seriously be said to have anything to do with PLCAA at all:

- All six allege violations of statutes, thus triggering PLCAA's predicate exception (four allege violations of independent New Jersey

statutes, while *Point Blank* and *Butch's* allege violations of Section 35(a)(2)'s requirement of reasonable controls);

- Three do not even seek relief based on harm resulting from downstream bad acts by a third party, thus not implicating PLCAA at all (*Point Blank*, *Butch's*, *Sig Sauer*);

- A fourth is not against a single PLCAA-protected entity (*JSD/Eagle*), even leaving aside Glock's Austrian parent (also not PLCAA-protected).

None of these actions, in short, looks anything like the kind of strict-liability-style regime the NJAG properly disclaimed. And while NSSF may disagree that Glock *engaged* in misconduct, *e.g.*, Br.12, that goes to the merits, which Glock is already defending in the state enforcement action.

By contrast, the NJAG *never* represented that it would only pursue Section 35(a)(1) independently-unlawful claims—that is, claims based only on "some other" independent statutory duty. *Contra* Br.1. To the contrary, although counsel pledged no actions based simply on engaging in lawful firearms commerce, counsel specifically explained that a covered entity could be held accountable for its own "culpable misconduct," which could mean *either* violating a separate provision or "doing something that is a tort." *See supra* at 9-10; JA373, 377, 393 (distinguishing strict-liability-style theories from unlawful or tortious conduct). Indeed, at oral argument, NSSF's counsel complained that the NJAG had *not*

made the kind of concession NSSF now asserts, JA413-16, while the NJAG's counsel emphasized the importance of Section 35's reasonableness provisions for situations in which defendant's actions might "check[] the boxes on the law" but that remain wrongful because they are unreasonable, and even gave a hypothetical, JA444. So the fact the NJAG proceeded with actions under a law that NSSF has always disfavored could well have been a basis for NSSF to seek to intervene in those actions to press its good-faith legal disagreements—or it "could have asked the Attorney General to clarify what he will prosecute," *NSSF I*, 80 F.4th at 221—but offers no basis for its regrettable accusations of bad faith.

2. NSSF's claim that Section 35 is "flagrantly and patently violative of express constitutional prohibitions," Br.47 (quoting *Younger*, 401 U.S. at 53), falls short for related reasons. To fit within that limited exception, a law must be unconstitutional "in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." 401 U.S. at 53-54. But NSSF's concessions and decision to abandon its facial claims make clear that is not true here.

None of NSSF's theories leave Section 35 entirely invalid; they only support the kinds of as-applied challenges state courts can also handle.

As to NSSF's preemption claims—even assuming they are "constitutional" for *Younger* purposes, *but see NOPSI v. New Orleans*, 491 U.S. 350, 366-67 (1989) (reserving this question)—NSSF admits Section 35 comports with PLCAA in numerous applications. *See supra* at 18. Indeed, not even NSSF argues Section 35 is invalid where the NJAG (1) alleges violations of separate statutes or regulations and/or (2) sues entities not protected by PLCAA at all, like Glock's Austrian parent or the *JSD/Eagle* defendants. That is why the state trial court was correct in rejecting Glock's motion to dismiss. JA911-13. The federal district court's since-vacated order granting a facial preliminary injunction does not help NSSF either, *contra* Br.47-48, particularly where NSSF itself has disavowed that holding—conceding it is not entitled to facial relief under PLCAA. *E.g.*, JA436; *supra* at 18. Nor does NSSF reprise its facial Commerce Clause, due process, and Second Amendment theories here.

NSSF's First Amendment theories do not leave Section 35 unconstitutional "in every clause, sentence and paragraph" either. Such claims are not truly *facial*; they exclusively apply to hypothetical enforcement suits based on unreasonable marketing (rather than on a gun's design), Br.48-52 (describing unreasonable-marketing claims NSSF fears)—and,

even then, NSSF admits, it would be permissibly applied to "market[ing] an unlawful product," *see* JA854. Nor, contrary to NSSF's best efforts, does *Glock* implicate the First Amendment, *contra* Br.52-53; rather, as the state court correctly observed, that suit "is based on conduct—design, manufacturing, and distribution decision—not speech," and any references to "marketing or communications" are clearly for their "evidentiary" value (to show the plausibility of the allegations) and not a "basis for liability." JA914.[4] That is not basis to evade *Younger* either.

   3. NSSF also cannot show the kind of irreparable injury necessary to avoid abstention. *See* JA23 n.13 (district court finding no irreparable harm). Bluntly, there is no irreparable harm from having to litigate these issues in state court, *see FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) ("litigation expense" is not irreparable harm), because state

---

[4] NSSF reads one sentence of dicta at the end of this paragraph as "beyond the pale," Br.52 (citing JA914), but misreads that line: the judge was not deeming every possible marketing restriction valid under the First Amendment, but rather observing (unremarkably) that any incidental burden on Glock's marketing would have met the applicable level of scrutiny *as applied in that case*. Moreover, NSSF's complaints about a particular state-trial-court opinion show that the remedy is for Glock to appeal, not to allow a collateral attack on the state judge's work in federal court by Glock's trade organization—the very type of harm *Younger* guards against.

courts have "inherent authority" and are "presumptively competent" to handle them, *Tafflin v. Levitt*, 493 U.S. 455, 458, 465 (1990). So before its member Glock will have to reform its conduct or pay penalties, a coequal court would have to adjudicate all these arguments, appealable "through the New Jersey appellate system all the way up to the United States Supreme Court." JA23 n.13; *accord NSSF I*, 80 F.4th at 222 (noting anyone sued under Section 35 can raise "the same arguments made in the pre-enforcement challenge [] as affirmative defenses" in state court).

NSSF's responses are unavailing. To the extent NSSF fears that it would experience harm distinct from Glock's, as it may be denied permissive intervention in that case, that is conjectural, especially where the NJAG would not oppose intervention, *see supra* at 45, and when the injury it cites for Article III purposes is Glock's own. And NSSF's concern that it would now be denied intervention rests squarely at NSSF's feet: it never sought intervention at all, and simply waited until February 2025 to try to reopen this case—underscoring "it felt little need to move quickly." *Cf. DSSA*, 108 F.4th at 206 (explaining that equity "assists the diligent, not the tardy"). This is not the kind of certain and immediate irreparable harm sufficient to overcome *Younger* and allow collateral

litigation in federal court. *Cf. Olde Disc. Corp. v. Tupman*, 1 F.3d 202, 212-13 (3d Cir. 1993) (*Younger* inapplicable where intervention needed to preserve federal right to arbitration). The district court correctly abstained.

B.    *Brillhart-Wilton* Also Requires Federal Courts To Abstain.

*Brillhart-Wilton* abstention likewise bars this as-applied collateral attack on the *Glock* suit. *Cf. NOPSI*, 491 U.S. at 359 (observing that "the various types of abstention are not rigid pigeonholes" (cleaned up)). The *Brillhart-Wilton* doctrine permits federal courts to hold declaratory actions in abeyance if parallel proceedings are ongoing in a state forum. *See Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282-88 (1995). Like *Younger*, that doctrine applies here.

Under *Brillhart-Wilton*, the "existence of pending parallel state proceedings militates significantly in favor of declining jurisdiction" unless outweighed by opposing factors. *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 144-45 (3d Cir. 2014). These factors include:

- (1) the likelihood that a federal-court declaration will resolve the uncertainty that gave rise to the dispute;

- (2) convenience of the parties;

- (3) the public interest in settling the uncertainty;

- (4) the availability and relative convenience of other remedies;

- (5) a general policy of restraint when the same issues are pending in a state court;

- (6) avoidance of duplicative litigation; and

- (7) preventing use of the declaratory action "as a method of procedural fencing or as a means to provide another forum in a race for *res judicata.*"

*Id.* at 146. The doctrine applies equally to injunctive claims "dependent on declaratory claims," such as where (as here) a "preemption claim cannot be adjudicated without the requested declaratory relief." *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 498 n.21 (3d Cir. 2017) (cleaned up).

These factors heavily favor abstention. Glock has already advanced the same theories in state court—which already denied its motion to dismiss based on these arguments, creating a particularly significant risk of conflicting rulings. *See Berkley Ins. Co. v. Daniels*, No. 23-3031, 2024 WL 3379068, at *3 n.5 (D.N.J. Apr. 24, 2024) (noting factors turn on whether the same issues must be resolved in both actions, even if the parties are not identical). The risk of gamesmanship is stark too: allowing NSSF to relitigate the same claims that its member Glock has thus far lost

provides a second bite at the apple that any state-court defendant would be eager to copy. *See also* JA22 n.12 (district court noting possible forum-shopping here). And unlike the duplication, potential conflicting judgments, and gamesmanship that two-track litigation would entail, the most convenient course is to allow Glock to continue litigating its arguments in the New Jersey courts, "all the way up to the United States Supreme Court." JA23 n.13. Finally, as with *Younger*, the parties and issues need not be identical—"a substantial similarity in issues and parties" suffices. *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 284 & n.8 (3d Cir. 2017). That is especially apt here, where NSSF's standing as a membership organization is based entirely on the harms Glock faces from the pending state suit.

Whether under *Younger* or *Brillhart-Wilton*, the answer is the same: the collateral federal litigation NSSF seeks to initiate, based on the harms to its member Glock, is both duplicative and inconsistent with our federalist system. The district court was right to abstain.

## II. NSSF Cannot Avoid Abstention Through Its Other As-Applied Claims, Because They Are Not Justiciable.

NSSF accuses the district court of improperly abstaining from *all* its claims, Br.32-33, but misunderstands the ruling below. The district

court correctly viewed NSSF's as-applied attack on the *Glock* case as not only the centerpiece of NSSF's suit (and the enforcement action that immediately preceded it) but also the only then-existing suit against an NSSF member and thus the only one for which NSSF had proven Article III standing. *See* JA6-8, 10-12. Having found this claim triggered *Younger*, the district court properly held that NSSF thus "failed to demonstrate a likelihood of success on the merits." JA23; *see* JA23 n.13 (concluding irreparable harm was lacking in any event). But the NJAG never argued, nor did the district court ever find, that NSSF "is foreclosed from pursuing claims on behalf of *any* of its members" just because one as-applied claim is barred by *Younger*. *Contra* NSSF Br.26. Instead, the reason the district court did not have to address those claims further is because NSSF's other as-applied claims are not justiciable.

To understand why NSSF has no other claims that satisfy Article III at this juncture, it is important to understand what claims NSSF now pursues—and what it does not. To start, NSSF no longer presses the facial theory under which the district court previously granted a preliminary injunction, *see supra* at 18, and precedent—including *NSSF I*—regardless forecloses any facial claim. *See supra* at 50-51; *see also, e.g.*,

*Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024); *United States v. Rahimi*, 602 U.S. 680, 693 (2024). The *Glock* theory, meanwhile, was properly disposed of on abstention grounds. *Supra* Point I. So that leaves NSSF's three other as-applied, pre-enforcement theories: its demands for relief on behalf of members (1) that sell Glocks; (2) that produce guns NSSF thinks operate like Glocks; and (3) that NSSF thinks could face actions like *Butch's* or *Point Blank*. But NSSF has not established Article III standing or ripeness to bring pre-enforcement challenges on these three as-applied theories, which is why they offer no basis to circumvent *Younger* abstention. *See TransUnion v. Ramirez*, 594 U.S. 413, 431 (2021) ("standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press").[5]

None of these three as-applied, pre-enforcement theories remotely satisfy the test. *See NSSF I*, 80 F.4th at 219 (asking whether NSSF or its

---

[5] For that reason, if this Court disagrees as to any one of these as-applied claims, it should simply affirm in part and remand for further proceedings, *see, e.g.*, *United States v. Harris*, 144 F.4th 154, 165 (3d Cir. 2025), including consideration of how *Brillhart-Wilton* would apply to those claims, *see Reifer*, 751 F.3d at 144-146 (confirming discretion exists even in the absence of parallel state proceedings). NSSF did not press (and thus forfeits) the merits or other preliminary-injunction factors in its opening brief. *See Lofstad v. Raimondo*, 117 F.4th 493, 500 (3d Cir. 2024).

members "(1) intend to take action that is (2) arguably affected with a constitutional interest but is (3) arguably forbidden by the Law, and (4) the threat of enforcement against them is substantial" (cleaned up)). As to the entities who merely sell Glocks, *see* Br.13-14, there is no basis to conclude from these allegations that these members engaged in even "arguably forbidden" conduct or that there is any "threat of enforcement against them"—let alone a "substantial" threat. The *Glock* suit rests on an extreme course of alleged conduct: Glock knowingly designed its mainstay handgun to have automatic capability inhibited only by one easily suppressed component, knowing this design would invite use as a machinegun—with its founder going so far as to personally demonstrate how the Glock G17 could be "switched" into a machinegun to senior Venezuelan military officials at a Caracas shooting gallery in 1988. JA715. And indeed, when Glock saw harm mounting from this knowing design choice, it chose to continue embracing its design in American markets (while introducing a cure for the problem in others), and even linked to videos glorifying "switched" Glock machine guns. *See* JA710-34, 747-49. That is kind of extreme conduct that (if true) would indeed yield a violation of the NJPLA, *see*, *e.g.*, *Jurado v. W. Gear Works*, 619 A.2d 1312, 1317 (N.J.

1993), and reveal a specific intent to facilitate machinegun creation, *cf.*
*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280,
298 (2025)—none of which can be said of someone who simply puts Glocks
on their shelves, which is all NSSF's retailer members have alleged that
they do, or wish to do. JA232-34, 240-42, 255-56, 277. So there can be no
substantial threat of enforcement against such retailers—nor, of course,
has there *been* any enforcement against them, or any communications by
the NJAG (who possesses an exclusive cause of action under this statute)
suggesting they face any such risk. *Compare*, *e.g.*, *SBA List v. Driehaus*,
573 U.S. 149, 164-65 (2014) (substantial threat where there was history
of past enforcement, complaint could be filed by "any person," there were
20-80 enforcement proceedings per year, and agency had refused to disa-
vow enforcement against statements at issue).

Nor does NSSF get further by asserting that it has members who
manufacture pistols it claims are "substantially similar in design to"
Glocks. Br.13-14. NSSF alleges only that such pistols are "similar" in that
they likewise use a striker-fire (or similar) mechanism—as distinct from
the hammer-fire mechanism. *See* JA204-05, 292, 299. But that alone
hardly establishes a substantial threat of enforcement, because the *Glock*

suit itself contrasted Glocks with "most other handguns, even other 'striker-fired' handguns, which … require time-consuming and cumber-some work to be switched" to machineguns. JA719 ¶93; *see* JA733 ¶¶125-26 (likewise distinguishing Glock). And nothing in NSSF's filings alleges its other manufacturer-members specifically intend to make weapons for easy machinegun-conversion, knowingly avoid or wish to avoid curative alternatives in U.S. markets even while deploying those alternatives elsewhere, or otherwise wish to promote such illegal conversions. Since NSSF's allegations indicate no course of conduct by its members similar to Glock's, it likewise establishes no substantial threat of enforcement against the very kind of manufacturers whose products were *distin-guished* by the *Glock* complaint.

Finally, with respect to an as-applied claim based on the facts of the *Point Blank/Butch's* lawsuits, *see* Br.33-34, NSSF fails to identify mem-bers who wish to engage in sufficiently similar conduct—selling massive quantities of ammunition, for cash, with no controls whatsoever to block sales to prohibited-persons. *See SBA List*, 573 U.S. at 159 (plaintiff must allege "intention to engage in a course of conduct" that is arguably pro-scribed); *NSSF I*, 80 F.4th at 219-21 (same). Indeed, NSSF's own briefing

says it did not sue (or intervene) after the *Point Blank/Butch's* actions—instead bringing this collateral attack only after *Glock*—because it viewed those as presumptively "isolated incidents" that never "reach[ed] NSSF's members." Br.12.

That NSSF's members say they initiated additional controls in the wake of *Point Blank/Butch's*, Br.13, JA227, 256, 278, 314, does not change the answer. As noted, no NSSF member claims it wishes to avoid engaging in any diligence whatsoever when a customer seeks to buy large volumes of ammunition for cash—the extreme failures that yielded the actions against Point Blank and Butch's. But without a substantial threat of enforcement, NSSF's members "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *see also NSSF I*, 80 F.4th at 222.

It also makes sense that NSSF members do not allege an intention to act as Point Blank and Butch's did. As NSSF presumably recognized in clocking these as "isolated incidents" that "would not reach NSSF's members," Br.12, these were hardly edge cases: Butch's and Point Blank each sold a thousand rounds of ammunition to cash purchasers with no

controls whatsoever, despite the risk that a would-be purchaser was a felon, domestic-abuser, or terrorist. *See* 18 U.S.C. §922(g), (n) (prohibiting certain persons from possessing ammunition). Little surprise Point Blank settled for $2,500 and a plan to fix the problem, and Butch's was found liable for $8,000 and ordered to do the same. JA684-90, 919-27. Nor, to be clear, could these suits have implicated PLCAA, *i.e.*, NSSF's central claim; they sought no relief resulting from later "criminal or unlawful misuse" of the ammunition at all, a precondition for PLCAA to apply. *See* 15 U.S.C. §§7903(5)(A); JA635-41. That is likely why neither Point Blank nor Butch's even raised PLCAA as a defense. JA673.

That also confirms why any broader challenge to Section 35(a)(2) is still hopelessly abstract. The provision can operate in lawful applications, as in *Point Blank* and *Butch's*, or when a business leaves guns by an unsecured window and posts pictures of its unsecured guns online, *see* ECF 73 (FSS Armory's admission of liability); JA596, 619-22 (rejection of FSS's PLCAA defense). NSSF instead hypothesizes that Section 35 *could* be enforced in *other*, impermissible ways, but that requires fact-specific litigation about those hypothetical applications if they ever come to pass, *see NSSF*, 80 F.4th at 219-21—and as explained, none has yet come close.

There was thus no abstention analysis to be done for the three other pre-enforcement, as-applied challenges: no NSSF members allege an intention to engage in conduct that would draw a substantial threat of enforcement, because NSSF rests on the NJAG's prior enforcement actions, and none of NSSF's other members engage in or wish to engage in relevantly similar conduct. So with the *Glock* application itself resolved by abstention, NSSF offers no other basis to revive its long-closed case to pitch an abstract challenge to hypothetical applications of Section 35(a)(2)—the precise volley this Court already rejected in *NSSF I*.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:  /s/ Tim Sheehan
Tim Sheehan
Assistant Attorney General

Dated: January 2, 2026

# CERTIFICATE OF COMPLIANCE

I certify under Fed. R. App. P. 32(g)(1) and L.A.R. 31.1(c) that:

1.   This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 12,999 words, excluding sections exempted by Fed. R. App. P. 32(f), and thus does not exceed the 13,000-word limit.

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Times New Roman that is at least 14 points.

3.   This brief complies with L.A.R. 31.1(c) in that prior to being electronically filed with the Court today, it was scanned by the following virus-detection software and found to be free from computer viruses:

Company: McAfee, Inc.
Product: McAfee Endpoint Security, version 10.7.0.3113

4.    This brief complies with L.A.R. 31.1(c) in that the text of the electronic brief is identical to the text of the paper copies.

/s/ Tim Sheehan
Tim Sheehan
Assistant Attorney General

Dated: January 2, 2026

## CERTIFICATION OF BAR MEMBERSHIP

      I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Tim Sheehan
Tim Sheehan
Assistant Attorney General

Dated: January 2, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2026, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

 /s/ Tim Sheehan
Tim Sheehan
Assistant Attorney General